SUZANNE N. DWYER, APPELLEE AND CROSS-APPELLANT, V. OMAHA-DOUGLAS PUBLIC BUILDING COMMISSION ET AL., APPELLANTS AND CROSS-APPELLEES, DANIEL C. LYNCH, INDIVIDUALLY, INTERVENER-APPELLEE.

195 N. W. 2d 236

Filed February 25, 1972. No. 38299.

Donald L. Knowles, James M. Murphy, Harold M. Zabin, Herbert M. Fitle, Frederick A. Brown, and Verne W. Vance, for appellants.

McGrath, North, Nelson, Shkolnick & Dwyer, for appellee.

August Ross, for intervener-appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH, McCOWN, NEWTON, and CLINTON, JJ.

CLINTON, J.

Plaintiff, a taxpayer in Douglas County, Nebraska, and in the City of Omaha, brings this action on behalf of herself and others similarly situated to challenge the constitutionality of L.B. 1003 enacted by the Eighty-second Legislature, sections 23-2601 to 23-2612, R. S. Supp., 1971. L.B. 1003, hereafter referred to as the act, pertains to cities of the metropolitan class, the population of which is more than half the population of the county in which the city is located, and likewise pertains to such counties. It authorizes the county and city to initiate proceedings for the establishment of a building commission which is a "body politic and corporate and an instrumentality of the state." The act provides that the commission shall have a governing body of five appointed as provided therein and authorizes the commission to acquire in the "name of the city and county, by gift, grant, bequest, purchase or condemnation real property"; to annually levy a tax "for the pur-

poses of the commission not to exceed one half mill on the dollar upon the assessed valuation of all the taxable property in the county"; and to issue bonds which are the general obligation of the commission but not of the state, city, or county. The underlying purpose of the act is expressed in the following language: "The purpose of sections 23-2601 to 23-2612 is to provide a means whereby buildings, structures and facilities can be acquired, constructed, remodeled or renovated and financed for use jointly by such cities of the metropolitan class and the respective counties in which they are located." § 23-2601, R. S. Supp., 1971.

The act grants the commission certain corporate powers, for example, to sue and to be sued; to acquire, hold, and dispose of property; and to make by-laws and regulations for the management of its affairs and the use of its projects. It authorizes, with the consent of the city and county, use of their facilities, agents, and employees, and authorizes the commission to reimburse the city and county for such use. It authorizes agreements with the city or county or both as to the operation, maintenance, repair, and use of the property; it authorizes with the consent of the city and county agreements with various governmental entities state and federal for use of the projects; and it grants to the commission power of eminent domain. The authority of the commission to issue bonds requires prior approval of the city and county. The act also provides: "The full faith and credit of the commission shall be pledged to the payment and security of the bonds and notes issued by it, whether or not such pledge shall be set forth in the bonds or notes. So long as any of its bonds or notes are outstanding, the commission shall have the power and be obligated to levy taxes within the limitation as provided in section 23-2604 to the extent required, together with any other money available to the commission therefor to pay the principal of and interest and premium, if any, on such bonds and notes as the same

become due and payable. . . . The bonds, notes, obligations or liabilities of a commission shall not be a debt of the State of Nebraska or of the city or county for which the commission is established and neither the state, city, nor the county shall be liable thereon or therefor, nor shall such bonds, notes, obligations or liabilities be payable out of any money other than the money of the commission issuing or incurring the same." The act contains many other provisions, some of which will be noted as this opinion proceeds.

Pursuant to the provisions of the act the county board of Douglas County enacted a resolution activating the Omaha-Douglas Public Building Commission and appointed two members of the commission. The mayor of Omaha, with the approval of the city council, appointed two members and the four members appointed the fifth. On July 8, 1971, the commission levied, pursuant to the provisions of the act, a one-half mill tax on all taxable property in the county.

The case was tried on stipulation of facts, reference to which will be made as necessary. It was stipulated that for the 1971-72 fiscal year the mill levy for Douglas County is at the constitutional limit and if the levy made by the commission is includable in the county levy then the total county levy is in excess of the limitation provided by Article VIII, section 5, Constitution of Nebraska, which is as follows: "County authorities shall never assess taxes the aggregate of which shall exceed fifty cents per one hundred dollars actual valuation as determined by the assessment rolls, except for the payment of indebtedness existing at the adoption hereof, unless authorized by the vote of the people of the county."

The district court determined the levy by the commission was in effect a levy for county purposes and therefore in excess of the constitutional limit and void. It enjoined the commission from expending, pending final disposition of the case, any funds which may be

raised by the one-half mill levy. The trial court found in all other respects the act was constitutional. The defendants appealed. The plaintiff cross-appeals and claims the act is unconstitutional in toto contending, as she did in the trial court, the act is in violation of the following constitutional provisions, to wit, Article I, section 26; Article III, sections 14 and 18; Article VIII, sections 5 and 7; Article IX, sections 2, 4, and 5; and Article XIII, section 2, Constitution of Nebraska.

The necessity or wisdom of the legislation is not for this court to determine. We only determine whether it contravenes some constitutional provision which renders it invalid in whole or in part. We first determine the correctness of the trial court's decision on the issue raised on the main appeal and then we will examine the questions raised in the cross-appeal.

The briefs of counsel are able and exhaustive. Counsel for all parties cite authorities which seem directly applicable or applicable in principle and, in our judgment, support their respective contentions on the issues raised on the main appeal and on which the trial court rested its decision. We, however, examine these authorities and make our decision in the light of what we deem the pertinent provisions of the Nebraska Constitution and certain pertinent general principles of constitutional interpretation previously announced by this court.

## The Appeal
### Article VIII, section 5

The constitutional provisions which must be considered are Article III, section 1; and Article VIII, sections 1 and 5. Article III, section 1, vests the complete legislative authority of the state in the Legislature subject only to the rights of initiative and referendum reserved by the Constitution to the people, and, of course, subject to any specific restrictions on the legislative authority found in the Constitution itself. The appellee contends that as applied to the facts of this case Article VIII, section 5, which we have previously quoted, is such a spe-

cific restriction. Article VIII, section 1, provides in part as follows: "The necessary revenue of the state and its governmental subdivisions shall be raised by taxation in such manner as the Legislature may direct."

There can be no doubt, of course, that the Legislature cannot authorize the counties to levy taxes in excess of the constitutional maximum set by Article VIII, section 5. The appellee argues the act does exactly that by indirect means and that the commission is merely the " 'alter ego' of the city and the county," a legistive creation established "solely to circumvent the county's constitutional tax limitation."

The decision we reach is arrived at in the light of the following principles and the three constitutional provisions hereinbefore cited. The Legislature has plenary legislative authority limited only by the state and federal Constitutions. Swanson v. State, 132 Neb. 82, 271 N. W. 264; Albuquerque Met. Arroyo Flood Con. A. v. Swinburne, 74 N. M. 487, 394 P. 2d 998. The language of the Constitution is to be interpreted with reference to the established laws, usages, and customs of the country at the time of its adoption. The Constitution must be read in connection with the facts of history and the development of a representative form of government. The Constitution as amended must be construed as a whole. Legislative construction of a statutory or constitutional provision, although not conclusive on the courts, when deliberately made is entitled to great weight. State ex rel. Johnson v. Chase, 147 Neb. 758, 25 N. W. 2d 1. The Legislature may create political corporations or quasi-municipal corporations to deal with matters of general public concern and utility. Neal v. Vansickle, 72 Neb. 105, 100 N. W. 200. The power to tax being a sovereign power, constitutional provisions relating thereto do not operate as grants of power of taxation to the government, but are merely limitations on a power which would otherwise be unrestricted. Constitutional limitations on the power to tax must be

strictly construed. Ryder v. Livingston, 145 Neb. 862, 18 N. W. 2d 507, 159 A. L. R. 458.

In the Constitution of 1866 the legislative authority of the state was vested in the Legislature without any reservation to the people of either initiative or referendum. It contained no provision whatever with reference to the counties. It mentioned no municipal or quasi-municipal corporations save cities and incorporated villages, and with reference thereto directed the Legislature to make provision for their organization by general law and to restrict the power of taxation "to prevent the abuse of such power." Counties were apparently already in existence pursuant to territorial law. In 1873, the Legislature confirmed the boundaries of these and created others. It likewise made provision for the government of counties and made provision defining the powers and duties of counties and their officers. The powers granted were minimal corporate powers. It also made provision for courts and law enforcement, taxation and collection of taxes, laying out of roads, and the keeping of real estate records. It authorized the counties upon a vote of the people to issue bonds to aid in boring for coal in their respective counties. Among the specific powers was the following: ". . . and in case there are no county buildings, to provide suitable rooms for county purposes." G.S. 1873, p. 234.

A constitutional limitation on the power of county authorities to tax first appeared in the Constitution of 1875. Art. IX, § 5. Previous limitations were statutory only. At that time also appeared limitations on the power of the Legislature to change county boundaries and to create counties. Prior to the 1920 revision of the Constitution the inhibition on the county tax read: ". . . shall never assess taxes . . . which shall exceed one and a half dollars per one hundred dollars valuation . . . ." Questions arose as to whether the valuation referred to was actual value or assessed value. See

Constitutional Convention 1919-1920, Proposed Amend. to Art. 9, § 5, p. 32. This was clarified and defined in the 1920 constitutional revision in its present form.

In all the years intervening between 1866 and the present, the Legislature has at will added to the powers and duties of the counties and from time to time taken away certain powers, but mostly it has added functions or duties. A comparison of the pertinent statutory provisions in the General Statutes of 1873, Compiled Statutes of 1922, and Revised Statutes of 1943, readily illustrates these points. Counties could also exercise under statutory provisions some of the same functions as other subdivisions and within the same territory. For example, the laws of 1873 authorized the commissioners at their discretion to build or repair bridges within the limits of any town or city in the county. The county at times could improve city streets. G.S. 1873, p. 954. See, also, § 1045, Comp. St. 1922; § 23-339, R. R. S. 1943.

The Legislature has from time to time entrusted like functions to different governmental subdivisions and agencies and created new governmental subdivisions to exercise these same functions. Flood control and drainage have been entrusted both to counties, §§ 1025, 1026, 1033, Comp. St. 1922; § 23-320.05, R. R. S. 1943; and to drainage districts, Ch. 17, art. IV and V, Comp. St. 1922. Counties may maintain hospitals, § 23-343.08, R. R. S. 1943; and this also may be done by hospital districts, §§ 23-343.21 to 23-343.47, R. R. S. 1943.

The legislative authority to create subdivisions of government to perform special governmental functions to meet the exigencies of changing situations and special needs has been exercised through the years, especially during the last 40, without constitutional restriction. Sanitary districts, Whedon v. Wells, 95 Neb 517, 145 N. W. 1007; rural fire protection districts, Seward County Rural Fire Protection Dist. v. County of Seward, 156 Neb. 516, 56 N. W. 2d 700; airport authorities, hous-

ing authorities, weed control districts, and later county-wide weed control authorities. Numerous other examples could be cited. The power of the Legislature in this respect has been stated in broad and all-inclusive language in several cases. See, Nickel v. School Board of Axtell, 157 Neb. 813, 61 N. W. 2d 566; Seward County Rural Fire Protection Dist. v. County of Seward, *supra;* Kaup v. Sweet, 187 Neb. 226, 188 N. W. 2d 891. In Seward County Rural Fire Protection Dist. v. County of Seward, *supra,* this court cited with approval the following language of Hunter v. City of Pittsburgh, 207 U. S. 161, 28 S. Ct. 40, 52 L. Ed. 151: "Municipal corporations are political subdivisions of the State, created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them. . . . The number, nature and duration of the powers conferred upon these corporations and the territory over which they shall be exercised rests in the absolute discretion of the State. Neither their charters, nor any law conferring governmental powers, or vesting in them property to be used for governmental purposes, or authorizing them to hold or manage such property, or exempting them from taxation upon it, constitutes a contract with the State within the meaning of the Federal Constitution. The State, therefore, at its pleasure may modify or withdraw all such powers, may take without compensation such property, hold it itself, or vest it in other agencies, expand or contract territorial area, unite the whole or a part of it with another municipality, repeal the charter and destroy the corporation. All this may be done, conditionally or unconditionally, with or without the consent of the citizens, or even against their protest. In all these respects the State is supreme, and its legislative body, conforming its action to the state constitution, may do as it will, unrestrained by any provision of the Constitution of the United States. Although the inhabitants and property owners may by such changes suffer in-

convenience, and their property may be lessened in value by the burden of increased taxation, or for any other reason, they have no right by contract or otherwise in the unaltered or continued existence of the corporation or its powers, and there is nothing in the Federal Constitution which protects them from these injurious consequences. The power is in the State and those who legislate for the State are alone responsible for any unjust or oppressive exercise of it."

The question then becomes precisely this. Does Article VIII, section 5, operate to prevent the Legislature from taking from the counties, or a class thereof, some of their functions and entrusting them to another subdivision of government, giving to that new subdivision of government a power of taxation which may result in the people in the county paying total taxes in excess of the maximum set by Article VIII, section 5. The appellee argues that it does. Her argument and that of the intervener are highlighted in the memorandum opinion of the trial judge where he points out that section 23-120, R. S. Supp., 1971, requires the county to "erect or otherwise provide" courthouse, jail, and other necessary county buildings and therefore to have this function performed by another subdivision of government having taxing authority is simply an evasion of the constitutional limitation of counties to tax.

The briefs of the appellee and intervener and the trial judge's memorandum opinion make special reference to certain provisions of the act, section 23-2611, R. S. Supp., 1971, which provide that the city and county may each "(5) . . . enter into an agreement with the commission" determining "the method or formula for determining the payments to be made by the city to the commission as being applicable to the principal of and interest and premium on the bonds of the commission issued to finance the project. The city shall have the power to levy a tax on all the taxable property in the city, except intangible property, sufficient to make

the payments to the commission applicable to the principal of and interest and premium on the bonds of the commission issued for the project, which tax shall be in addition to all other taxes now or hereafter authorized by statute or charter . . .," but limits the maximum tax to one-half mill. They further point out that no specific mention is made in the act of the county making payments to the commission applicable to the bonds, nor is any added taxing authority given to the county by the act.

It is evident that whatever obligation the county assumes with reference to the commission it must be made within the limits of its existing levy for county purposes, which as already noted is for the fiscal year 1971-72 at the constitutional maximum. The appellee and intervener therefore reason and conclude, as did the trial court, that the one-half mill tax authorized to be made by the commission is to be used to pay what they term "the county's share" of the bonded debt and that the act must contemplate an agreement to this effect. There is in the record, however, no evidence of any agreement between the commission and either the county or the city. The act itself, as we have earlier noted, provides for the payment of the bonds from the funds of the commission.

The appellee's and intervener's position and argument are not implausible and are supported by cases cited by them, but we are not, in the light of the pertinent constitutional provisions, the history which we have recited, and the provisions of the act itself, persuaded that the act is beyond a reasonable doubt unconstitutional on the point in question. State v. Standard Oil Co., 61 Neb. 28, 84 N. W. 413; Smith v. Chicago, St. P., M. & O. Ry. Co., 99 Neb. 719, 157 N. W. 622.

The position of the appellee and intervener as noted in the memorandum opinion of the trial court really seems to be that Article VIII, section 5, is not only a limitation on the power of the counties to tax, but also

freezes the power of the Legislature to make changes in county functions. Their argument would in effect imbed part of section 23-120, R. S. Supp., 1971, in the Constitution. We find that in the light of history and the provisions of Article III, section 1, and Article VIII, section 1, we cannot accept this argument. Throughout our history as a state, the Legislature has, as we have already noted, added to and taken away the functions of counties. It has created governmental subdivisions to accomplish special public purposes, which purposes it could have entrusted to existing governmental subdivisions. It has entrusted the same general functions to different subdivisions of government whose territories could overlap or coincide.

Under the facts of this case, the commission does not take over a function exclusively that of the county. It serves the public purpose of providing facilities for two governmental units or more. It relates not just to a courthouse, jail, and governmental offices, but "any building, structure or facility for public purposes" for joint use of the city and county. We point out the act authorizes the leasing of space not needed by the county and city to other agencies of government. Section 23-120, R. S. Supp., 1971, entrusts to the county the duty of furnishing facilities to agencies which do not serve exclusively county functions. That section of the statute reads in part: ". . . and provide suitable rooms and offices for the accommodation of the several courts of record, compensation court or any member thereof, the Commissioner of Labor for the conduct and operation of the state free employment service . . . ." It would be completely unrealistic to say that the Legislature may add county functions but never take them away and entrust them to some other governmental subdivision or even to the state itself.

With specific reference to the question of whether the levy the commission has authorized to make is in reality a county tax, we think the opinion of the court

in Obitz v. Airport Authority of the City of Red Cloud, 181 Neb. 410, 149 N. W. 2d 105, is pertinent. The Airport Authority Act provided that bonds issued by the authority would not (just as in the act we are here considering) constitute a debt of the State of Nebraska or the city in which the authority was established. In the bonds which it proposed to issue the authority covenanted to, so long as the bonds were unpaid, certify annually to the city the maximum tax and to assess charges for airport use. It was argued that the bond covenants violated the statute. In effect the argument was that the tax was a city tax. In the Obitz case Judge Carter, speaking for the court, said: "The amount to be certified to the city to be levied on the tangible property of the city is for the purpose of carrying on the airport facility. It is not levied for the primary purpose of providing for the funding of bonds. The money derived from this tax is a part of the money provided for the construction, operation, and maintenance of the airfort facility. It is a part of the funds of the authority and is not at any time funds of the city although the city performs the ministerial duty of levying, collecting, and paying the tax to the authority. The tax can be levied whether or not the bonds are issued. The tax is in effect that of the authority, a separate entity, a public corporation, and an agency of the city. It is in no sense of the term a city tax, and when the city performs its ministerial functions with reference to its levy, collection, and payment over, the city's responsibility ceases, and no obligation remains. The bonds are general obligations of the authority and not the city. The provision of section 3-509, R. R. S. 1943, that the bonds of the authority shall not be a debt of the city has not been violated for the reason that the city is under no obligation to pay the bonds." The above is applicable here. The one-half mill levy is the levy of the commission and not of the county.

It does appear that counties as subdivisions of

government did and do occupy a unique place in the eyes of the drafters and the people, the ratifiers, of the Constitution. See Article IX. It would appear the Legislature probably cannot substantially destroy the counties by removing all or substantially all of their functions while merely respecting their territorial integrity as required by Article IX. The act does not even remotely approach the point of such substantial destruction, nor do the statutes evidence the slightest tendency on the part of the Legislature to so do. Quite the contrary is evident.

We have already noted the parties each cite several cases supporting their respective contentions. We want to take specific note of some of these. The appellants cite Albuquerque Met. Arroyo Flood Con. A. v. Swinburne, *supra*. In that case the Legislature of New Mexico had created the plaintiff flood control authority which was apparently empowered to deal with flood control in and around the city of Albuquerque. As far as is pertinent to our problem here a two-pronged attack was made on the constitutionality of the act. The constitutional provisions were: "No county, city, town or village shall ever become indebted to an amount . . ., exceeding four per centum on the value of the taxable property within such county, city, town or village . . .," and "The legislature is authorized to provide by law for the organization and operation of drainage districts and systems . . . ." With reference to the first prong, the court said: "It is clear that the indebtedness proposed by the Flood Control Authority is not one contracted by either a county, city, town or village or school district, but is one imposed by a special quasi-municipal corporation under legislative authority. The legislature has plenary legislative authority limited only by the state and federal constitutions. Legislation may be validly enacted if not inhibited by one or the other of these documents." With reference to the second, the court said simply that such provision in

no way restricted the authority of the Legislature to create a flood control authority and that there was no requirement of the constitutional provision mentioned that a flood control authority had to be called a drainage district.

Appellants also cite Walinske v. Detroit-Wayne Joint Bldg. Authority, 325 Mich. 562, 39 N. W. 2d 73. There a majority of the voters of Wayne County had approved an $8,000,000 bond issue, the proceeds of which were to be used to construct a joint city-county building. A companion question authorizing an increase in the mill levy failed to get the required two-thirds voter approval. At the session of the Legislature following the election that body enacted enabling legislation authorizing the City of Detroit and the County of Wayne to incorporate a joint building commission authority. The enabling legislation authorized the authority to issue self-liquidating revenue bonds. The enabling act contained other provisions similar in some respects to L.B. 1003, but did not give the authority power to levy a tax. The enabling act provided that when the bonded debt was paid the facilities were to be turned over to the city and county. The authority had an authorized life span of 50 years. This legislation was challenged in a declaratory judgment and injunction action. The principal contention was that the city and county by entering into a long term lease sufficient to pay bonds of the authority as they became due was a circumvention of the constitutional and statutory provisions requiring a vote of the people to issue bonds. The court dealt with this contention by stating the bonded debt was the debt of the authority and not of the city and county and it was clearly within the authority of the city and county to provide the necessary facilities by lease arrangements with the authority. Other cases supporting appellants' position are Book v. State Office Bldg. Comm., 238 Ind. 120, 149 N. E. 2d 273; City of

Aurora v. Aurora Sanitation Dist., 112 Colo. 406, 149 P. 2d 662.

One of the several cases cited by the appellee is War Memorial Hospital v. Board of County Commissioners, 73 Wyo. 371, 279 P. 2d 472. That case involved a proceeding to determine the validity of taxes levied by a hospital district, a cemetery district, and a fire protection district. All the districts embraced the same territory and included the town of Powell. The constitutional provision in question was: "No incorporated city or town shall levy a tax to exceed eight mills on the dollar in any one year, except for the payment of its public debt and the interest thereon." The court held the provision in question was a restraint upon the authority of the fire protection district to levy a tax on property in the city of Powell, but not a restraint upon the authority of the hospital and cemetery districts. The court rested its decision primarily on the ground that fire protection was a municipal function but the operation of a cemetery and hospital was not, or at least the court had doubts as to these. We do not distinguish the case or others of similar tenor. We reject them for reasons already stated. Other cases of the same general purport are Lowery v. County of Jefferson (Ky. App.), 458 S. W. 2d 168; Bacon v. Kent-Ottawa Metropolitan Water Auth., 354 Mich. 159, 92 N. W. 2d 492; Rappaport v. Department of Public Health, 227 Ind. 508, 87 N. E. 2d 77.

### Cross-Appeal

Appellee Dwyer on her cross-appeal raises the issues previously noted.

### Article XI, section 5

Appellee contends the act, insofar as it authorizes the City to levy a tax to meet its obligations to the commission, is unconstitutional in that it violates Article XI, section 5, because the act authorized a levy in excess of and in addition to the maximum all-purpose levy provided for in the home rule charter of the city of

Omaha which was adopted under the above constitutional provision. Appellee cites Omaha Parking Authority v. City of Omaha, 163 Neb. 97, 104, 77 N. W. 2d 862: ". . . a provision of a home rule charter takes precedence over a conflicting state statute in instances of local municipal concern, but when the Legislature enacts a law affecting municipal affairs which is of state-wide concern, the state law takes precedence over any municipal action taken under the home rule charter."

The term state-wide as correctly quoted from the above opinion is somewhat misleading when examined in the light of the genesis of the rule and the language of other cases which discuss the issue. These other cases have distinguished "between matters of *strictly* municipal concern and those of state concern." In Carlberg v. Metcalfe, 120 Neb. 481, 234 N. W. 87, the court said: "The Constitution does not define which laws relate to matters of strictly municipal concern and which to state affairs. There is no sure test which will enable us to distinguish between matters of strictly municipal concern and those of state concern. The court must consider each case as it arises and draw the line of demarcation. . . . It is the well-established law of this state that, in matters of strictly municipal concern, cities which have adopted a 'home rule' charter under article XI of the Constitution are not subject to state legislation. But, in such cities, state legislation is not excluded upon such subjects as pertain to state affairs as distinguished from strictly municipal affairs."

One of the first cases to discuss the issue of when a general law of the state takes precedence over a conflicting city charter provision was Consumers Coal Co. v. City of Lincoln, 109 Neb. 51, 189 N. W. 643. That case pointed to the language of the constitutional provision providing that the charter shall be "consistent with and subject to the Constitution and Laws of this state," and further noted the purpose of the constitutional amendment was to render the charter cities inde-

pendent of state legislation in matters which are strictly of municipal concern. It pointed out the city was independent only in those matters "for its own government" and where powers are entrusted to a city which are not strictly for its own government then general state law takes precedence. In this case it seems clear the act pertains to much more than just the government of the charter city. It encompasses and pertains to county affairs also and to the extent it authorizes the furnishing of facilities for other state and federal agencies it is even broader yet. L.B. 1003 does not violate either Article XI, section 5, or the Omaha charter.

Article III, section 14

Appellee contends the act is unconstitutional because it amends sections 23-119, R. R. S. 1943, and 23-120, R. S. Supp., 1971, without repealing those sections, and therefore it violates Article III, section 14.

Insofar as this contention pertains to section 23-119, R. R. S. 1943, we have decided that point by what has been said on the main appeal. If, as we hold here, the one-half mill levy is not a county levy, then section 23-119, R. R. S. 1943, has not been amended and Article III, section 14, does not apply.

The same may be said of section 23-120, R. S. Supp., 1971, which provides: "The county board shall erect or *otherwise provide* suitable courthouse, . . ." etc. (Emphasis supplied.) Section 23-120, R. S. Supp., 1971, is not amended by L.B. 1003. The provisions of L.B. 1003 are not mandatory. The county may act under section 23-120, R. S. Supp., 1971, or it may "otherwise provide" by availing itself of the provisions of the act which is a complete and independent act in itself. The act does not amend section 23-120, R. S. Supp., 1971. In any event, Article III, section 14, does not apply. See Omaha Parking Authority v. City of Omaha, *supra.*

Article III, section 18

Appellee contends the act violates Article III, section 18, because it is a "local or special" law "granting . . .

special or exclusive privileges" and that a general law "can be made applicable." She asserts the classification limiting the application of the act to cities of the metropolitan class and the counties in which they are located, where the population of the city is more than one-half the population of the county, is arbitrary and relies upon the opinion of this court in City of Scottsbluff v. Tiemann, 185 Neb. 256, 175 N. W. 2d 74. In that case this court held unconstitutional a statute which provided for a mandatory municipal court in cities of the first class having a population in excess of 13,000 and located in counties having a population of 33,000 all as determined by the 1960 census. Only one city of the first class fits this description and because the population figures were tied to the 1960 census no other city could ever enter the class. This court held since the class was closed the limitation was arbitrary and the statute was unconstitutional. In this case the class is an open one so City of Scottsbluff v. Tiemann, *supra,* does not apply on that point.

In City of Scottsbluff v. Tiemann, *supra,* the court went on to say that the classification itself was arbitrary, pointing out that five other cities of the first class exceeded Scottsbluff in population and were not included within the class established by the statute, and further pointed out that tieing the class to county population was arbitrary since the court would serve only the city and the county population had no reasonable relationship. This court could discern, properly so, no reason for such classification. Does the present case come within the ambit of the second point in Tiemann? In Tiemann, this court said: "The power of classification rests with the Legislature and cannot be interfered with by the courts unless it is clearly apparent that the Legislature has by artificial and baseless classification attempted to evade and violate provisions of the Constitution prohibiting local and special legislation." Appellee calls our attention to the fact

that in section 1 of the act the Legislature recites that the need for joint facilities exists in cities located in counties where the city constitutes more than half the population of the county, but the act in the enabling portions thereof limits its application to only those cases where the city is of the metropolitan class. There are in fact nine cities and counties within the "class" mentioned in section 1.

Limiting application of the act to cities of the metropolitan class and the county in which located would seem clearly to be a proper classification. Lennox v. Housing Authority of City of Omaha, 137 Neb. 582, 290 N. W. 451; Omaha Parking Authority v. City of Omaha, *supra.* Appellee's position seems in effect to be that the recital of need in section 1 is a sort of admission against interest by the Legislature which somehow binds that body and this court to the position that the only reasonable classification is the one referred to in section 1. Appellee cites no pertinent authority. We must view the act on the basis of the class to which it in fact applies. Cities of the metropolitan class are those cities of population of 300,000 or more. The Legislature can certainly take cognizance of the fact that the actual population of the only city presently in the next class is approximately 154,000 and in the next class below that approximately 31,000. The need for joint facilities certainly may vary according to population. We cannot say the classification used by the Legislature here is clearly arbitrary and without any substantial basis founded upon real differences.

Article IX, section 4

Article IX, section 4, provides: "The Legislature shall provide by law for the election of such county and township officers as may be necessary." Appellee asserts the provision of the act providing for appointment of members of the commission violates the above section. The answer is the members of the commission are not county officers. This is implicit in the light of

our holding on the main appeal and we so hold.

### Article IX, sections 5 and 2

Article IX, section 5, provides: "The Legislature shall provide by general law for township organization, under which any county may organize whenever a majority of the legal voters of such county voting at any general election shall so determine; and in any county that shall have adopted a township organization the question of continuing the same may be submitted to a vote of the electors of such county at a general election in the manner that shall be provided by law." We cannot see how the act impairs the right of the people of any county to avail themselves of the provisions of Article IX, section 5. The contention is without merit.

Article IX, section 2, contains prohibitions against territorial division of counties without a vote of the electors of each county affected. The act did not violate this section.

### Article XIII, section 2

Appellee contends that the act violates Article XIII, section 2, because it authorizes a donation by the city and county to a work of internal improvement. She points to sections 4(6) and (13), and 11(3) of the act and relies upon Lewis v. Board of County Commissioners of Sherman County, 5 F. 269, quoting from this case as follows: "It may be conceded as a general proposition, that a 'courthouse' is a work of internal improvement." She omits, however, the balance of the sentence: "but it may very well be questioned whether our internal-improvement law of the fifteenth of February, 1869, has any application to such a work of internal improvement." In short the court was talking about the definition of the term under a statute enacted by the Legislature. The court then pointed out that other statutes covered the building of courthouses. What we are here concerned with is the meaning of the term under the constitutional provision. The term was defined and the question here involved was pre-

cisely decided in State v. Bone Creek Township, 109 Neb. 202, 190 N. W. 586. There this court said: "In forbidding subdivisions of the state to 'make donations' to any railroad, or other 'works of internal improvement,' without submitting to the electors a proposition to do so, the framers of the Nebraska Constitution of 1875 and the people who adopted it had in mind the evils arising from excessive donations of public funds to enterprises performing public services for private gain. Public buildings used exclusively for governmental purposes, without direct pecuniary profit to any corporation, or individual, are, in the popular sense, internal improvements, but they are obviously not within this constitutional inhibition." Other courts have arrived at similar conclusions. State ex rel. Thomson v. Giessel, 267 Wis. 331, 65 N. W. 2d 529; Rippe v. Becker, 56 Minn. 100, 57 N. W. 2d 331, 22 L. R. A. 857; Attorney General ex rel. Brotherton v. Common Council of City of Detroit, 148 Mich. 71, 111 N. W. 860.

Article VIII, section 7

Appellee asserts that the act insofar as it authorizes a city to levy a tax violates Article VIII, section 7, which provides in part as follows: "The Legislature shall not impose taxes upon municipal corporations, or the inhabitants or property thereof, for corporate purposes." Obitz v. Airport Authority of the City of Red Cloud, *supra*, offers a complete answer to this contention. That case says the constitutional provision in question applies only where (1) the levy is for corporate or proprietary purposes, and (2) where it is not levied by local authority. We hold the act pertains to a governmental purpose and the tax is levied by local authority within the meaning of Obitz.

The judgment of the district court that the levy by the commission is in effect a levy for county purposes and enjoining the commission from expending any funds which may be raised by the one-half mill levy is reversed. The judgment that in all other respects the

act is constitutional is affirmed. The judgment is affirmed in part and in part reversed, and the cause is remanded to the district court to enter judgment in conformity with this opinion.

AFFIRMED IN PART, AND IN PART
REVERSED AND REMANDED.

BOSLAUGH, J., dissenting.

The purpose of the act in question is to provide a means whereby buildings, structures, and facilities may be acquired and constructed for joint use by metropolitan cities and the counties in which they are located. § 23-2601, R. S. Supp., 1971. To help finance the plan, the building commission established pursuant to the statute is empowered to levy up to one-half mill upon all the property in the county. § 23-2604, R. S. Supp., 1971.

This tax appears to be the only source of funds provided by the county to defray its share of the expense of the project. In effect, it is a county tax to pay for a county courthouse. The district court correctly held this levy subject to the limitation contained in Article VIII, section 5, of the Constitution of Nebraska.

If the constitutional limitation upon taxes for county purposes has become burdensome and unwise, as suggested recently by the Nebraska Constitutional Revision Commission, the remedy lies in a repeal of the limitation.

NEWTON, J., joins in this dissent.

NEWTON, J., dissenting.

The question at issue is whether sections 23-2601 to 23-2612, R. S. Supp., 1971, comprising L.B. 1003, Eighty-second Session of the Nebraska Legislature, and the construction of a courthouse thereunder, comprise an unconstitutional effort to evade the provisions of Article VIII, section 5, Constitution of Nebraska. That section of the Constitution is as follows: "County authorities shall never assess taxes the aggregate of which shall exceed fifty cents per one hundred dollars actual valua-

tion as determined by the assessment rolls, except for the payment of indebtedness existing at the adoption hereof, unless authorized by a vote of the people of the county."

The legislative bill mentioned will hereinafter be referred to as "the act." Its declared purpose is to provide a means "whereby buildings, structures and facilities can be acquired, constructed, remodeled or renovated and financed for use jointly" by metropolitan cities and the counties in which they are located. It creates a public building commission but provides it can *only be activated by resolution of the county board.* The commission shall be governed by a board of five members, two appointed by the county board, two by the mayor of the city, and the fifth by the other four members. They serve without compensation. The life span of the commission is 20 years or until all liabilities and bonds have been discharged, after which its properties vest in the county and the city. The commission may acquire personal property and also real property, the latter either by gift, purchase, or condemnation. It may also levy a tax not exceeding one-half mill "upon the assessed valuation of all the taxable property *in the county,*" and issue bonds subject to authorization by the city and *the county.* (Emphasis supplied.) The commission books are to be audited by the *county auditor.* The city and county may each *operate and maintain* any project of the commission, *appropriate funds therefor,* convey property to it, *acquire real property for its use,* and contract for the use of commission projects. The city may levy a tax sufficient to make payments accruing on bonds issued: "* * * *Provided,* that if the city shall be subject to a limitation by statute or charter on the amount of taxes which may be imposed by the city for its operating expenses, the maximum which may be levied in excess of such limitation pursuant to the authorization of this subdivision, shall not exceed one half mill on the dollar of assessed valuation of all

taxable property except intangible property; * * *."
§ 23-2611, R. S. Supp., 1971.

A county is a governmental or political subdivision of the State and has only such powers as are conferred by legislative act. See Lindburg v. Bennett, 117 Neb. 66, 219 N. W. 851. As far back as 1856, when Nebraska was still a territory, counties were authorized and required to provide "courthouses." Laws 1856, p. 71. Counties are still *required* to perform this traditional function. See § 23-120, R. S. Supp., 1971. Notwithstanding the act in question, the construction of courthouses remains a primary county function, just as does the building and maintenance of highways and bridges and the operation and financing of county offices. In fact, without a courthouse, a county could not function at all. If the duty to build a courthouse, jail, etc., primarily county functions to be provided for by a county tax levy, can be abdicated by legislative fiat and financed by some other governmental unit specially created for that purpose, then the same can be done with *all other* county financed activities. The constitutional limitation on levies for county purposes becomes absolutely meaningless as it can be evaded at will. That the act was conceived for purposes of evasion is readily apparent on examination of legislative committee proceedings which reveal the following statements: ·
"SENATOR SNYDER: (Introducer of the Bill.) * * * The city is not included in this bill. The city says it has the money it needs to build the city-county building. But, the county has had its mill limit, and if it is going to partake in a city-county building, it is going to have to find an additional means of revenue. * * *
"SENATOR CARPENTER: You are tryng to bring out that the county board is going to be the landlord, right?
"MR. CAVANAUGH: No, Sir. They are going to build the building; the commission is going to be the landlord.
"SENATOR CARPENTER: Well, it is about the same

thing. You are going to guarantee it—the county is.

"MR. CAVANAUGH: The county and the city, through our agreements. * * *

"MR. JOHNSON: Senator Carpenter and members of the Committee, I'm Warren Johnson from the Omaha Chamber of Commerce, Staff Manager of the Chamber. The Omaha Chamber has consistently supported the building of a city-county civic center. We feel that LB 1003 provides a means for the county to finance its particular share as you've heard it explained, * *.*. * * *

"SENATOR CARPENTER: One other question. On this bill, for example, it says in this language, 'to a project of partly for such purposes and partly for other city or county purposes, by purchase or condemnation in the manner prescribed by law and acquisition.' Are we talking about the acquiring of existing roads, streets, parkways, etc.? Why do you have to have the (inaudible) for a project or partly for such purposes and partly for other city or county purposes?

"MR. HASSETT: (Member of Douglas County Board) The only purpose that is in there is that the bond attorneys have tried to write this so that if it is attacked at court, it would hold up in the Supreme Court. * * * As far as we're concerned, we would be just as happy with that out, because we have just one thing in mind, and that is to build the city-county building in a block immediately west of the courthouse. * * *

"MR. HASSETT: And if we can amend that and take those provisions out, and still have this a constitutional bill, we would support it, because we have no other projects in mind. * * *

"SENATOR GOODRICH: Mr. President, Members of the Body, I'd like to call your attention to the fact that this is a building which will be a joint-use building between the city council and the county commissioners. Consequently the county only has to come up with half of the cost of this building or less. * * *

"SENATOR SNYDER: * * * So it is imperative that

the Legislature pass LB 1003 if the county is going to be able to fulfill its part of the financing."

These quotations have no direct bearing on the issues of constitutionality, but they do indicate the legislative purpose and intention.

The act itself makes it clear that it is a patent attempt to evade the constitutional provision. It will be noted that the commission can only be activated by the county board; commission members are appointed by the city and county officials; it can levy a tax only on the assessed valuation *of the county,* but *the city may and must levy its own tax* for its contribution. The books are audited by the county and both the county and city may transfer real and personal property to the commission without consideration. Both the city and the county may operate and maintain commission projects and appropriate funds therefor. On the demise of the commission, its properties revert to the city and county. It is contemplated that the county may occupy the combination courthouse and city hall free of charge.

It is a well-settled rule that a county can exceed the constitutional limitation on county levies only when authorized by a vote of the people of the county. See Chase County v. Chicago, B. & Q. R.R. Co., 58 Neb. 274, 78 N. W. 502. Also, avoidance of the constitutional limit cannot be accomplished by indirection. Grand Island & W. C. R.R. Co. v. County of Dawes, 62 Neb. 44, 86 N. W. 934. In a similar case, the court commented: "If constitutional and statutory prohibitions could be evaded in this manner, they would in effect be completely nullified and constitute no restraint against the evils they were intended to correct." Warren v. County of Stanton, 145 Neb. 220, 15 N. W. 2d 757.

The trial judge aptly and ably analyzed the situation as follows: "In appraising the validity of the Statute before it and the action taken to proceed thereunder, the Court must consider the purpose of the debt limita-

tion section of the Constitution and must look through the form of the Statute to the true inwardness of the situation and to the substance of what it does.

"It seems that the clear purpose of Section 5, Article VIII of the Nebraska Constitution was to prevent the creation of an excessive debt (tax) by a *real* limitation upon the powers of the Legislature and the Counties to authorize (taxation) indebtedness beyond a certain amount unless authorized by a vote of the people.

"If the Constitution may be circumvented by the simple device of creating new and additional political subdivisions in the same territory to perform a function assigned by statute to another political subdivision, each with separate and independent taxing power, for the purpose of evading the Constitutional prohibition, no real limitation upon the Legislature and the Counties to levy taxes is provided and the object of the Constitutional provision is defeated.

"If one unit of government after another may be imposed upon the same territory for substantially the same purpose, or if every purpose may be subdivided and new debt limits created for each subdivision, there will be, in effect, no Constitutional debt (tax) limitation at all."

In a similar situation, the court in Lowery v. County of Jefferson (Ky. App.), 458 S. W. 2d 168, stated: "The purpose of creating any kind of separate taxing district would seem to be to provide financing for the accomplishment of a public purpose which for some reason or another cannot effectively be accomplished through the facilities and resources of a traditional municipality such as a county or city. Examples are fire protection districts, drainage districts, library districts, health districts, road districts, flood-control districts, hospital districts, etc. But if such a district is to have the power to impose taxes separate and apart from county or city taxes, and not chargeable to the rate limit of any county or city, it is plain that the ultimate power to decide whether the tax shall be levied cannot be vested in

the governing body of a county or city, for then the purported district is in reality nothing but a subterfuge to evade limits on tax rates. For illustration, if the fiscal court of a county has sole voice as to whether or not a particular tax shall be levied upon the taxpayers of the county, it would be pure sophistry to say that the tax is not a *county* tax."

In the case before us, the county alone can activate the commission which is tantamount to invoking the tax levy provided for in the act.

In War Memorial Hospital v. Board of County Commissioners, 73 Wyo. 371, 279 P. 2d 472, it was held: "The establishment of public cemetery and public hospital not being a distinctive governmental function of city, and not having been made essential governmental function pursuant to distinct statute, taxing powers of hospital district and cemetery district were not affected by constitutional prohibition against any incorporated town or city levying tax in excess of eight mills on dollar, and tax authorized by statute for upkeep of such districts could be levied by county board notwithstanding that total levy already requested by municipality affected might be eight mills. * * *

"Under provision of constitution prohibiting any incorporated town or city from levying tax in excess of eight mills on a dollar, imposition of additional three mill tax levied by fire protection district to which municipal corporation belonged was forbidden in view of fact that fire protection was a necessary municipal and governmental function which municipality was required to perform."

The providing of a courthouse is certainly a governmental function specifically required of a county by statute.

In Bacon v. Kent-Ottawa Metropolitan Water Auth.. 354 Mich. 159, 92 N. W. 2d 492, the court dealt with a similar constitutional tax limitation and in denying the taxing power of the authority reasoned as follows:

" 'Careful study of the amendment leads to these conclusions: Clearly the intent was to provide by the fundamental law of the State, which had not theretofore contained such provision, a general limitation upon the exercise of the taxing power of the State. The evil or abuse sought to be remedied was excessive taxation imposed by governmental agencies without the consent of those upon whom the burden was placed.'

"Of such economic conditions the 15-mill amendment of 1932 was conceived, initiated, supported and adopted. But what about the *existing law* defining 'a municipal corporation,' with respect to which the people presumptively determined to apply such final exception? Was it intended to include an 'authority' which—a quarter century later—has been authorized or created by legislative act and dubbed, by legislative fiat, 'a municipal corporation'? To speak plainly, an affirmative answer to this last question—if given—will automatically grant to the legislature the power of outright repeal of a duly-voted constitutional provision.

"* * * Did the people will that the expression 'a municipal corporation' should be construed as meaning or referring to some entity or agency other than those already commonly known or recognized by 'existing laws' as municipal corporations? Did they bother to resolve a statewide constitutional limitation upon the power of property taxation and, by the same instrument of resolution, mean to provide the legislature with power to nullify the limitation as applied to legislatively manufactured new types of 'municipal corporations'? Are we to say that the electors of 1932 planned to hand the existing or any future legislature the power and authority to undo, at will, that which became the essence of their resoundingly successful initiatory effort?"

The cited cases make it clear that the majority opinion, by judicial and legislative fiat, has nullified the constitutional limitation on levies for county purposes. It deprives the electorate of that portion of their right of

suffrage guaranteed by the Constitution as it relates to excess county levies. In the creation of new governmental subdivisions empowered to levy taxes, a line can logically and should be drawn between essentially state, county, or municipal governmental powers and others.