17]          AUGUST TERM, 1919.          251

State ex rel. Atwood v. Johnson, 170 Wis. 251.

STATE EX REL. ATWOOD VS. JOHNSON and others.
[Soldiers' Educational Bonus.]

*November 8—November 17, 1919.*

*Soldiers' educational bonus: Taxation: Public purpose: Bonus as an expression of gratitude: Stimulation of patriotic duty: Bonus not compensation to recipient: Constitutional law: Governmental function: Insuring domestic tranquillity: Providing for common defense: Troops furnished by state to nation: Courts: Wisdom of legislation not question for courts: Practical construction of constitutional provisions: States: Loaning credit or creating debt: Aid to religious. schools.*

1. The purpose of the Educational Bonus Law (ch. 5, Laws 1919, Special Session) as gathered from the act itself supplemented by contemporaneous history, is to express by material means the gratitude of the people of the state to those of its citizens who signally and heroically performed the task that called them into action during the recent emergency, and primarily to stimulate patriotism and quicken the perception in our citizens of their sacred duty to defend the government in time of need. Whether the volunteer system of the Civil War or the selective service method be employed, stimulation of patriotism is necessary because heroic and successful action in an emergency springs from patriotic desire and not from compulsion.

2. The gift or bonus provided by the act is not granted by way of extra compensation for services rendered, nor to reimburse the soldier, but to express the gratitude of the state and stimulate love of country in the donor, the recipient, and the public at large, to the end that an impressive object lesson in patriotism be conveyed.

3. If the important documents that have given birth to our government be examined to see what their framers considered governmental or public purposes, it will be seen that the Declaration of Independence, Articles of Confederation, and our National and State Constitutions expressly declare that the insuring of domestic tranquillity and providing for the common defense are strictly governmental functions; and the ultimate sanction behind security is the force of the militia, just as the compelling power of a court's decree is the power of the state to enforce it.

4. Unless it clearly appears that the expenditure of the money levied will have no tendency to effectuate the purpose sought to be accomplished the act is valid, for its purpose is to promote in the citizenry of the state a readiness to serve when its tranquillity is threatened; and the stimulation of this patriotic devotion is a governmental function.

5. Whether the law will effectuate its purpose sufficiently to justify the expenditure of money is a legislative question within the boundaries of the constitution; and the legislature might well say that an appreciation of the services rendered will tend to stimulate others in the future, that it will create a reciprocal understanding and confidence between soldier and citizen, permitting those who were debarred from active service to make an offering to those who served, and that the gratitude of the state should be expressed to those of our citizens who aided in repelling the invasion of our national security.

6. If the giving of money to returned soldiers is a public purpose, as was held in the *Cash Bonus Case* (*ante,* p. 218), the giving to them of an education is even more a public purpose, because in both peace and in war a free government's guaranty of continuity and security lies in the education of its people.

7. The federal government being a government of the states that compose it, a state furnishing troops to defend the nation defends itself; and the beneficiaries of the act were not agents of another government so that the state is precluded from granting a bonus to those of its citizens who were inducted into the national service. [Whether the state could lawfully extend the bonus to other than military servants furnished by it, not decided.]

8. Legislative enactments in Wisconsin and other states during the Civil War and thereafter, the policy of the federal government from an early date in regard to pensions, and contemporaneous legislation in nearly every state in the Union appropriating money to aid the returned soldier, while not conclusive, are very persuasive as to what is a public purpose, and will control in the absence of specific, express, or implied constitutional language to the contrary. *State v. Whitcom,* 122 Wis. 110, distinguished.

9. By the act the state does not lend its credit or create a debt, contrary to secs. 3 and 4, art. VIII, of the constitution, as the money is levied for the purpose of making a gift revocable at will and no contract relation is established. [Whether when the money is collected and is in the hands of the state treasurer a beneficiary could compel its payment, not decided.]

10. Financial benefit does not accrue to religious schools from the act, as they are not enriched by the service they render, only the actual increased cost to such schools occasioned by the attendance of the beneficiaries being paid to them.

ORIGINAL ACTION brought in this court to test the constitutionality of ch. 5, Laws 1919, Special Session.

The attorney general having declined to bring the action, the court granted leave to the relator to prosecute the same. The defendants are charged with the administration of the act, and judgment is prayed that this court determine the validity of the act and in case it is found invalid that its enforcement be restrained.

The complaint charges substantially the same grounds of invalidity charged in the *Cash Bonus Case,* decided herewith (*ante,* p. 218, 175 N. W. 589), and in addition thereto it is urged that the act in question is void because (a) it lends the credit of the state to private individuals; (b) a state debt is incurred, contrary to the provisions of secs. 3 and 4, art. VIII, of the constitution; and (c) it gives financial aid to religious schools.

The class to be benefited is thus defined in the act:

"Sec. 37.25 (1) Any person discharged, or released, or furloughed subsequent to April 7, 1917, upon honorable conditions, from any branch of the military or naval service of the United States including all Red Cross and other nurses in military camps or hospitals who were a part of the military or naval forces of the United States in this country or overseas during the war against Germany and Austria, and who at the time of entering such service, which must have been prior to November 1, 1918, was a resident of this state, and who was in the service at least three months, and who desires to continue his education in any of the public elementary, high, or vocational schools of the state, or in special schools organized for this purpose, or in the county training or county agricultural schools, or in the mining school, the normal schools, Stout Institute, or in the University of Wisconsin, or in any institution of learning in this state at which was organized an S. A. T. C. [Student Army Training Corps] or in any other institution of high

school or collegiate grade in the state not run for profit shall, under rules and regulations to be prescribed by the state board of education, be entitled to receive thirty dollars per month while in regular attendance as a student at any such institution, but not to exceed a total of one thousand and eighty dollars in lieu of the soldier bonus provided for in chapter 667 of the Laws of 1919, except as hereinafter provided. The benefit of this act shall not accrue to any person for time spent while taking training in any student army training camp, nor to any person, who, though inducted into service, did civilian work at civilian pay."

The act contains detailed provisions for its administration by the state emergency board and the Wisconsin state board of education, and levies a tax for five years for the expenses of administration and for the money to be expended thereunder. Such tax is not to exceed one mill on each dollar of the assessed valuation of property and a surtax on taxable incomes of individuals varying from seven-twentieths of one per cent. on the fourth thousand to one and two-tenths per cent. on taxable incomes of over $13,000. A surtax is also levied upon the taxable incomes of corporations, joint-stock companies or associations ranging from four-tenths of one per cent. on the first thousand to one and two-tenths per cent. on all taxable incomes in excess of $7,000. The first surtax is levied on taxable incomes for 1918.

The act also provides (sec. 37.253) that:

"(3) The services provided for in sections 37.25, 37.251, 37.252, and 37.253 shall be paid for by the state on the basis of the actual increased cost of operation in excess of the cost of the institution if such legislation had not been passed, and not at the ordinary rate of individual courses."

The attorney general entered a general demurrer to the complaint.

*Harry L. Butler* of Madison, special counsel for the State.

The *Attorney General* and *M. B. Olbrich,* deputy attorney general, for the defendant state officers.

For the defendants other than state officers there was a brief by *Crownhart & Wylie* of Madison, and oral argument by *Charles H. Crownhart.*

*Roy P. Wilcox* of Eau Claire appeared as *amicus curiæ* at the request of Wm. C. Johnson Post and Everett Hale Post of the American Legion.

The following opinion was filed February 10, 1920:

VINJE, J.    The main argument against the constitutionality of the Educational Bonus Law as well as that against the constitutionality of the Cash Bonus Law, decided herewith (*ante,* p. 218, 175 N. W. 589), is that the money levied by it from the taxpayers of the state is not to be spent for a public or governmental purpose.   It is argued that its only justification is gratitude for or appreciation of past military services; that the recipients thereof form no class by themselves distinguished by any characteristics which could form a legitimate basis for classification except past military service; that since it has been held, as it was in *State v. Whitcom,* 122 Wis. 110, 99 N. W. 468, that past military service did not exempt one from license fees or police regulations imposed upon an occupation, such service could not form the basis for a classification for recipients of a bonus from the state for educational purposes; that though education is a benefit to the state it is no more so in one class of its citizens than in another, and therefore the classification created by the act is unconstitutional.

This act, unlike that of the Cash Bonus Law (ch. 667, Laws 1919), does not declare the purpose of the bonus given the recipients to be "a token of appreciation of the character and spirit of their patriotic service and to perpetuate such appreciation as a part of the history of Wisconsin."   But it is not essential that the purpose of the act should be declared therein if such purpose can be gathered from the act itself, supplemented if need be by contemporary history.   In this case there can be no doubt about its

purpose. Public declarations have been too frequent and specific, and public feeling is too deep and pervasive, to admit at this early day of any mistake relative thereto. Its purpose was to show by material means, of such character and such proportion that it could not be misunderstood as mere idle expressions, the deep gratitude of the people of the state to those who so signally and heroically performed the task that called them into action, and who stamped the American—the Wisconsin—soldier as of the bravest and most efficient among the soldiers of the world. But this purpose, though public, appropriate, and laudable, was not the sole or even the main purpose of the act. The main purpose was to stimulate patriotism, to quicken the perception in our citizens that there is a sacred duty to defend the government in time of need, as well as to demonstrate that such defense is appreciated,—that republics are not ungrateful.

Nor is the gift here made an extra compensation for services rendered, though it must be admitted that a pure gratuity is sometimes called extra compensation. But such compensation, strictly speaking, is given to reimburse the recipient financially for service rendered, so that the total money consideration will equal the money value of such service. Its whole sanction lies in the fact that inadequate financial compensation was given in the first instance, and that in order to make it adequate additional compensation must be made. It is granted purely on a money basis, without regard to its effect upon the donor, the recipient, or the general public. A gift like this rests upon no such foundation. Its purpose is not to make the soldier financially whole, but to express gratitude and stimulate love of country in those that give, in those that receive, and in the public at large—to the end that an impressive object lesson in patriotism may be engraved in the hearts of all.

Sometimes purposes are so fundamental that they are lost sight of in a casual consideration. Their scope is so broad

and their object so pervasive that one often forgets that other more obvious but less important purposes lie within the boundary circumscribed by them. Thus, the power exercised by the courts and the binding effect of their decisions are often matters of comment. In one sense such statements are true, but upon a final analysis it will be found that the compelling sanction of the court's decree is force pure and simple. The power of the state and its readiness to carry into effect the decree of its courts is what gives them their real efficiency. Without such force and readiness their decrees could be laughed to scorn with impunity. Thus we often lose sight of basic causes that are seldom invoked and assume that other causes dependent upon them are the real ones.

The constitutional admonition (sec. 22, art. I) that a "frequent recurrence to fundamental principles" is essential to the maintenance of "the blessings of a free government" may well be invoked here. Let us briefly examine the important documents that have given birth to our government to see what their framers considered governmental or public purposes.

The Declaration of Independence states:

"We hold these truths to be self-evident: that all men are created equal, that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness. That to secure these rights governments are instituted among men."

Here, of course, is a very broad and general statement, but no one is so dull that he cannot spell out of it the specific fact that governments are instituted for the purpose of securing the enjoyment of liberty to the peoples thereof, and no one is so dull that he does not understand that in order to enjoy liberty within a nation there must be no foreign coercive force operating from without, and that it is a governmental function to repel such force if sought to be applied.

State ex rel. Atwood v. Johnson, 170 Wis. 251.

In the Articles of Confederation the statement is somewhat more specific, for there it is declared (art. III) that the "States hereby severally enter into a firm league of friendship with each other, for their common defense, the security of their liberties, and their mutual and general welfare."

In the preamble to the federal constitution the purpose of the new government is thus stated:

"We, the people of the United States, in order to form a more perfect union, establish justice, insure domestic tranquillity, provide for the common defense, promote the general welfare, and secure the blessings of liberty to ourselves and our posterity, do ordain and establish this constitution for the United States of America."

The preamble to our state constitution contains substantially the same language, applying it to our own state government.

Thus we see that these great documents expressly declare that the insuring of domestic tranquillity and the providing for the common defense are strictly governmental functions. Indeed, the very conception of a free government is bottomed upon the hypothesis of security from within and from without. That is the indispensable prerequisite of every stable government, and to maintain such security is its first duty. But the ultimate sanction behind security, both from within and from without, is force—the force of the militia, that necessary and integral part of every government expressly provided for in our federal and state constitutions.

It may be said that all this is trite and is conceded by everybody. If conceded, the concession goes deep enough to validate the law attacked, for its purpose is to promote in the citizenry of the state a readiness to serve it whenever its domestic tranquillity is threatened either from within or from without. That since it is the duty of government to maintain domestic tranquillity, and since that can success-

fully be done only by the patriotic devotion of its citizens, the stimulation of patriotism becomes a public or governmental function. If it be said, as it is, that the law will not effectuate that purpose sufficiently to justify the expenditure of the money levied, the juristic reply is that that is a legislative question pure and simple, unless it clearly appears that it has no tendency at all to do so—a position assumed by no one; and that it is not the function of courts to sit in judgment upon the wisdom of a legislative policy that lies well within the boundaries of the constitution.

- The legislative answer—warranted by the importance of the question involved—is that appreciation of service well rendered by those who have received the benefit thereof tends to better service of a like kind in future; that its effect is to stimulate others to become worthy of like appreciation; that it creates a relation of reciprocal understanding and confidence between soldiery and citizenry, thus promoting that unity of thought and feeling that must ever exist between the two if war is to be effectively waged; that, as many a faint and weary soldier's heart was strengthened and sustained by the knowledge that "the home fires were kept burning," and that the prayers, hopes, and aspirations around those fires supplemented his own, so will this gift quicken and perpetuate in the returned soldiers that mutual feeling thus engendered and make for better citizenship; and the donors who were largely debarred from taking an active part in the war will find their patriotism rekindled by being permitted to make a small offering to those who offered all, and that since the continuity of a republic depends largely upon the patriotism and the enlightenment of its people, the stimulation of both becomes not only a public purpose but a public necessity. Both must be zealously fostered in order to maintain national security. This the legislature might well say furnishes a valid basis for the gift.

Our government declared that our national security was

State ex rel. Atwood v. Johnson, 170 Wis. 251.

not only threatened but invaded before we entered the conflict. United States ships upon the high seas are United States territory, and such ships upon their lawful journeys, recognized as lawful not only by international law but by specific treaties with the aggressor, were destroyed without warning. To repel such invasion and to help crush the military spirit that disregarded the obligations of both treaties and international law we entered the conflict and assisted materially in bringing it to a successful close. For such service rendered by the recipients of this act gratitude must needs express itself in a substantial way. To do otherwise were a mere perfunctory act.

If, as held in the *Cash Bonus Case* (*ante*, p. 218, 175 N. W. 589), the giving of money to soldiers, which they may spend as they choose, is a public purpose, much more so must be the giving to them of an education. A free government's best guaranty of continuity and security lies in the enlightenment of its people. This is true both in time of peace and in time of war. The proved efficiency of our soldiers was in a large measure due to their excellent education, both technical and general; in their power of initiative; and in their willingness and ability to assume personal responsibility whenever the occasion demanded it.

But it is argued in effect that since we have abandoned the volunteer system of the Civil War and resorted to the draft system, stimulation of patriotism is not necessary; for the non-patriotic as well as the patriotic soldier can be drafted and made to serve. Yes, he can be drafted, and he can be made to serve; but think you the French soldiers at the Battle of the Marne exclaimed, "They shall not pass!" because they were drafted, or because they loved France? To their honor let it be said that their heroic and successful defense sprang from desire, not 'from compulsion.

It is also contended that the beneficiaries of the act were in the service of the United States and not in the service of

Wisconsin and therefore our state cannot lawfully spend money in gratuities to agents of another government. The federal government is our government none the less because we have a subordinate independent government of our own within it. The federal government in time of war must call upon the citizenry of the states for troops, it has none others. We are an integral part of the nation, hence a defense of the nation is a defense of us. In furnishing troops to the federal government we are in reality furnishing them to ourselves because they are to be used for our benefit. And since the recipients of the act must be residents of the state, we are limiting the bonus to the military servants furnished by our own state. Whether or not we could lawfully extend it to others it is not necessary to decide.

We have so far discussed the question from the standpoint of what is a public purpose within the meaning of the· organic acts creating our government. Let us now see if such construction has found confirmation in legislative acts in our state and elsewhere. Space will not permit of a detailed statement of such acts, but only a summary thereof. During the Civil War and thereafter from 1861 to 1872 no less than eighteen laws were enacted by our legislature providing for war loans and voluntary aid to soldiers and their families, the latter alone carrying appropriations under which expenditures to the extent of over $2,700,000 were made. Counted in present ability to pay as compared with the state's ability at the time the sums were levied, this would equal a present expenditure of over fifty million dollars.

Many other states, among which were Maine, New Hampshire, Vermont, Massachusetts, New York, New Jersey, Michigan, and Connecticut, also enacted laws providing for bounties or extra compensation to its Civil War veterans.

The federal government from an early date has granted

pensions to its soldiers and their dependents under a constitution no broader in its scope as to the public purposes of its government than is our own. Since 1865 it has spent over $5,250,000,000 for such purposes. And Congress has done this under a grant of power which must be found expressly or impliedly in the constitution, while our legislature acts under a grant of power that is limited only by what is expressly or impliedly prohibited by our constitution or by that of the United States. Hence, if the United States has lawfully granted pensions or bounties to its soldiers, it follows that we can lawfully do the same to ours. No one has successfully questioned the right of the United States to grant pensions or bounties.

Though our country did not enter the war till early in 1917, thirty-eight states besides our own have already enacted over one hundred and twenty separate laws appropriating money for expenditure incident to the enlistment and service of its soldiers therein. These laws range in content from cash bonus, land settlements, extra compensation, memorial funds, investment funds, celebration funds, reimbursement funds to schools, exemptions from certain public burdens, educational benefits, care for returning soldiers, aid to dependents of soldiers, to the appropriation of money for medals or engrossed certificates to be given to honorably discharged soldiers, and carry appropriations reaching millions of dollars, the bulk of which is for extra compensation, land settlements, and cash and educational bonuses.

It will thus be seen that the legislative construction in nearly every state in the Union is in accord with that of Wisconsin. While such construction is not conclusive upon courts it is very persuasive and will control in the absence of specific, express, or implied constitutional language to the contrary.

That the construction sustaining the constitutionality of the act is in consonance with judicial interpretation of

similar acts elsewhere and with former decisions of this court is shown in the *Cash Bonus Case,* and need not be repeated here.

The contention that the case of *State v. Whitcom,* 122 Wis. 110, 99 N. W. 468, is authority for the invalidity of this act is not tenable. There it was held that past military service did not exempt persons from the general tax laws and police regulations of the state because there was no valid basis for making a distinction or class for such purposes after they have become a part of the mass of citizenship. But it is there said:

"The federal government does, without question, discriminate by direct payment of money by way of pensions. To that end, doubtless, those who served the government in its wars are a legitimate class distinct from the rest of the community by reason of the service which they have rendered."

The latter situation is the one before us, and the cited case sustains the conclusion here reached.

It is also urged that under the provisions of the act the credit of the state is given to individuals and a state debt is incurred, contrary to the provisions of secs. 3 and 4, art. VIII, of the constitution. The money is levied for the purpose of making a gift—a pure gratuity—revocable at will. The law establishes no contract relation such as can compel its levy. Nor does it create a debt. *State ex rel. Owen v. Donald,* 160 Wis. 21, 59, 151 N. W. 331. Whether when the money is collected and is in the hands of the state treasurer a beneficiary clearly within the law could compel its payment need not now be decided. It is sufficient to hold that the state does not lend its credit or create a debt within the meaning of the constitution by making a voluntary lawful gift to a number of its citizens.

The contention that financial benefit accrues to religious schools from the act is equally untenable. Only actual increased cost to such schools occasioned by the attendance

of beneficiaries is to be reimbursed. They are not enriched by the service they render. Mere reimbursement is not aid. *Dorner v. School Dist.* 137 Wis. 147, 118 N. W. 353.

Questions raised but not herein treated are ruled by the *Cash Bonus Case,* decided herewith (*ante,* p. 218).

*By the Court.*—The demurrer to the complaint is sustained, and the action is dismissed upon the merits.