STATE OF NEBRASKA EX REL. VANCE D. ROGERS, APPELLANT AND CROSS-APPELLEE, v. WAYNE R. SWANSON, STATE TREASURER, APPELLEE AND CROSS-APPELLANT.

219 N. W. 2d 726

Filed June 20, 1974. No. 39032.

Kutak, Rock, Cohen, Campbell, Garfinkle & Woodward, for appellant.

Clarence A. H. Meyer, Attorney General, and Gerald S. Vitamvas, Deputy Attorney General, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, NEWTON, CLINTON, and BRODKEY, JJ.

SPENCER, J.

This appeal is from the denial of a petition for mandamus filed by Dr. Vance D. Rogers, relator-appellant. The problem involved is the constitutionality of sections 85-701 to 85-721, R. S. Supp., 1972, hereinafter

referred to as L.B. 1171, relating to education in independent institutions of higher education. The statute in brief provides for public grants to students in need of tuition aid to attend private colleges. The District Court determined the statute violated certain sections of the Constitution of Nebraska, and denied relator any relief. Relator perfected this appeal. Respondent-appellee cross-appeals because the trial court did not find a violation of Article I, section 4, Constitution of Nebraska, and also contends that the statute violates the federal constitutional prohibition against state establishment of religion.

Relator sought reimbursement of an expense incurred September 6, 1972, under the statute. On September 13, a warrant upon the treasury of the State of Nebraska was issued and transmitted to respondent, the State Treasurer, who refused to countersign it. The legality of respondent's action depends upon the constitutionality of the statute. The District Court held L.B. 1171 unconstitutional. We affirm.

Respondent invoked Article III, section 18, and Article VII, section 11, of the Constitution of Nebraska, the pertinent provisions reading respectively as follows: "The Legislature shall not pass * * * special laws in any of the following cases, * * *. Granting to any corporation, association, or individual any special or exclusive privileges, immunity, or franchise * * *. * * * where a general law can be made applicable, no special law shall be enacted. * * *

"No sectarian instruction shall be allowed in any school * * * supported in whole or in part by the public funds set apart for educational purposes, * * *. * * * the state Legislature * * * shall * * * (not) make any appropriation from any public fund, * * * in aid of any sectarian or denominational school or college, or any educational institution which is not exclusively owned and controlled by the state * * *."

After enactment of the statute in question, Article

VII, section 11, Constiution of Nebraska, was amended. The amendment does not affect the question involved herein. See Whetstone v. Slonaker (1923), 110 Neb. 343, 193 N. W. 749. We there held: "An act of the legislature that is forbidden by the Constitution at the time of its passage is absolutely null and void, and is not validated by a subsequent amendment to the Constitution authorizing it to pass such an act." Whether or not the amendment could possibly be so construed we do not pass upon its effect even though respondent argues the unconstitutionality of the statute under the amended version.

Respondent argues that L.B. 1171 is in violation of Article VII, section 11, of the Constitution of Nebraska, in that it amounts to an appropriation from a public fund in aid of a sectarian or denominational educational institution which is not exclusively owned and controlled by the state or a governmental subdivision thereof. Article VII, section 11, Constitution of Nebraska, was amended by the Constitutional Convention of 1920. The committee on education originally adopted the attitude that such aid should be denied to any educational institution which was not "exclusively controlled by the state." The motion was made that this be amended to read as it presently appears in the Constitution, "exclusively owned and controlled by the state." The proposer of the amendment stated his position as follows: "As far as I am personally concerned, I desire to have the Constitution prohibit any state aid under any guise to any educational institution other than the public school. It is not a difficult matter, if the Legislature sees fit to find an excuse in the interests of general welware, to make donations under the guise of military training or normal training or what not, in a private institution. I have absolutely no hostility to those institutions, but it will invariably bring on the kind of warfare that this state should stay clear from, if you mingle the state and church even to that extent."

Respondent argues: "We submit that if aid can be extended by a tuition grant of this nature, then the grant could be enlarged and the class of recipients could be enlarged until the state could be paying all tuition for all students in all private educational institutions in the state so long as the students were not pursuing a course of study leading to a degree of theology or divinity. We do not think this is within the intent of this constitutional provision."

The constitutional validity of an act of the Legislature is to be tested and determined, not by what has been or possibly may be done under it but by what the law authorizes to be done under and by virtue of its provisions. United Community Services v. The Omaha Nat. Bank (1956), 162 Neb. 786, 77 N. W. 2d 576. In that case we held that the Legislature cannot circumvent an express provision of the Constitution by doing indirectly what it may not do directly. Here the grant is not directly to a private school but rather to a student, but it must be used for tuition at a private school.

The following provisions from section 1 of L.B. 1171 are pertinent herein: "(2) The increasing costs of operating our independent colleges and universities have forced tuition increases which make freedom of choice in education difficult for many of the students of this state; * * * (4) A system of financial assistance to qualified residents of college age will enable them to attend qualified independent institutions of higher learning of their choice in this state." While the tuition payments are to be made to the students, they must be used in a private institution in this state.

It is a reasonable assumption that the intent is to indirectly benefit the private institutions. This is apparent when we consider section 5 of the act which indicates that the amount of the tuition grant to the student shall be based upon the charge of the institution over and above the amount of money he would spend for tuition had he attended the University of Nebraska at Lincoln.

In addition, it is to be noted section 6 provides that the state will look to the institution for any refunds that are made on the tuition grants should the student discontinue his attendance. It seems obvious that the Legislature recognized the fact that the student would merely be a conduit through which the funds would be funneled to the educational institution concerned.

The trial judge found the primary intent of the Legislature in enacting L.B. 1171 was to provide financial aid to private colleges and schools in Nebraska through tuition grants to the students attending those institutions, rather than to give financial assistance to resident students to enable them to attend an institution of their choice. He further noted that an examination of the legislative history and particularly the floor debate as well as the practical operation of the legislation indicates a primary concern for the continued solvency and operations of the institutions involved. In Norden Laboratories, Inc. v. County Board of Equalization (1973), 189 Neb. 437, 203 N. W. 2d 152, we held: "In the Legislature the record of a floor explanation or debate is legislative history, and it may be an extrinsic, secondary source in statutory interpretation."

In the debate on the bill Senator Carpenter said as follows: " '* * * we have a large number, not a large, a number of privately owned schools of all denominations who I think, as I recall, have about anywhere from 12-1500 vacancies in their dormitories and area of education in which they cannot fill. * * * Now if we don't do something for these private schools, they're going to have to close the doors to some of them.' " On another occasion Senator Carpenter said: " 'I would like to find some legal way in order to have the state make a contribution, either in the bill or any other area, in order to use up the unused parts of these private schools.' " Senator Johnson, one of the introducers of the bill, stated: " 'Mr. President, members of the legislature, it has been brought out that there are campuses

over the state where fine facilities, fine instructors, but they lack students.' " Senator Moylan stated: " 'Now it's not only a thing of keeping these colleges alive, it's the case of financial assessts (sic) to the state.' " It thus appears that the trial judge's finding with respect to the intent of the Legislature is adequately shown by the floor debate.

Relator argues that L.B. 1171 does not appropriate state funds to or in aid of institutions of learning not exclusively owned and controlled by the state and that Article VII, section 11, Constitution of Nebraska, was intended to prohibit only those appropriations made directly to private schools for their support and not those appropriations which aid students who attend such colleges. In Almond v. Day (1955), 197 Va. 419, 89 S. E. 2d 851, the Virginia court held a law for payment of tuition for orphans of war veterans at secondary schools and colleges approved by the state to be violative of the state's constitutional prohibitions against the appropriation of money to schools or institutions not owned or exclusively controlled by the state or subdivision thereof, or to any sectarian institution. The court interpreted "appropriation to" an institution to have reference to appropriations for the benefit of such an institution. It held that such appropriations violated the constitutional prohibition in question, even though payment was not made directly to the institution, stating that tuition fees go directly to the institution, "and are its very life blood."

The Supreme Court of Alabama, in Opinion of the Justices (Ala., 1973), 280 So. 2d 547, answered questions propounded by the Alabama House of Representatives concerning the constitutionality of a bill which provided for tuition grants to resident students attending private colleges and universities in Alabama. The Justices were of the opinion that the bill violated federal and state constitutional provisions insofar as it provided state funds to be used directly or indirectly for payment of tuition grants to students attending sec-

tarian schools. It is to be noted that the declaration of purpose of the Alabama act, like the act adopted by our Legislature, recited there were a number of accredited independent institutions whose facilities could be used effectively in the public interest by granting financial assistance to citizens of the state who chose to attend such colleges and by paying a portion of the tuition charges at such institution, thereby reducing educative costs to the taxpayers. The Alabama court further stated: "* * * we are of the opinion that the cumulative impact of the relationship between the State and church related institutions which is provided for in H.B. 247, involves 'an excessive entanglement' between the State and religion and would therefore be unconstitutional under the Religion Clauses of the First Amendment to the Federal Constitution, as well as its Alabama counterpart, Article 14, Section 263."

In Hartness v. Patterson (1971), 255 S. C. 503, 179 S. E. 2d 907, the South Carolina Supreme Court struck down a legislative enactment making public funds available to provide financial aid to students attending independent institutions of higher learning. The South Carolina act is very similar to our own. It provides tuition grants to students attending independent institutions of higher learning, creates a committee to administer the tuition grants, sets forth eligibility requirements for the students to receive the aid, and makes a tuition grant unavailable to any student enrolled in a course of study leading to a degree in theology, divinity, or religious education. It also sets forth the standards to be met by any participating independent institution of higher learning.

Quoting from the South Carolina case: "Under the terms of the Act, the tuition grant is made available to the student only after he has been accepted by or is registered in a particular eligible institution of his choice. After the tuition grant has been made, it is unlawful for the student to expend the funds for any purpose

other than in payment of his tuition at the institution he is authorized to attend under the tuition grant. It is conceded that the tuition grant is not made directly to the school, but is made to the student who is required to pay it to the school selected by him."

Section 3 of L.B. 1171 provides: "A tuition grant may be awarded to any resident of Nebraska who is admitted and in attendance as a full-time resident student at any independent institution and who established financial need." Section 6 of L.B. 1171, so far as material herein, provides: "If the student discontinues attendance before the end of any semester, or equivalent academic term, after receiving payment under the grant, the entire amount of any tuition refund due that student, up to the amount of any payments made under the annual grant, shall be paid by the independent institution to the State of Nebraska."

The holding of the South Carolina court in Harkness, *supra*, is as follows: "Use of public funds, under statute making such funds available to provide financial aid for students attending independent institutions of higher learning, to provide tuition grants to students attending participating religious institutions constituted 'aid' to such institutions within the meaning of, and prohibited by, article of Constitution prohibiting use of public money, directly or indirectly, to aid institutions of higher learning controlled by sectarian groups."

Miller v. Ayres (1972), 213 Va. 251, 191 S. E. 2d 261, involved statutes relating to tuition assistance loans at private institutions for collegiate or graduate education. The statutes provided that satisfactory scholastic achievement would be considered repayment of the loan. The court held the loans constituted gifts, and that since such gifts or grants may be made to students in sectarian institutions, they violate preceding provision of Constitution prohibiting state appropriation to schools and institutions of learning not owned or exclusively controlled by State or some subdivision thereof.

The South Dakota court in Synod of Dakota v. State (1891), 2 S. D. 366, 50 N. W. 632, 14 L. R. A. 418, expressly held that a constitutional prohibition of the appropriation of lands, money, or credit "to aid any sectarian school" applied to any such appropriation whether made as a donation or in payment for services rendered the state by said school, as in the case of payment of tuition for students being trained to teach in the common schools. The South Dakota court took the position that the payment of the plaintiff's university demand for tuition would be for the benefit of or to aid the university, although it was contended that it would be for services rendered to the state or to its students. The court stated that: "This contention, while plausible, is, we think, unsound, and leads to absurd results. If the state can pay the tuition of 25 students, why may it not maintain at the institution all that the institution can accommodate, and thereby support the institution entirely by state funds?"

In Committee for Public Education & Religious Liberty v. Nyquist (1973), 413 U. S. 756, 93 S. Ct. 2955, 37 L. Ed. 2d 948, the Supreme Court had before it a New York law granting tuition reimbursement and tax benefits to the parents of elementary and secondary private school students. The court stated: "As Mr. Justice Black put it quite simply in Everson: 'No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion.' 330 U. S. at 16.

"The controlling question here, then, is whether the fact that the grants are delivered to parents rather than schools is of such significance as to compel a contrary result. * * * Indeed, it is precisely the function of New York's law to provide assistance to private schools, the great majority of which are sectarian. By reimbursing parents for a portion of their tuition bill, the State seeks to relieve their financial burdens sufficiently to assure

that they continue to have the option to send their children to religion-oriented schools. And while the other purposes for that aid — to perpetuate a pluralistic educational environment and to protect the fiscal integrity of over-burdened public schools — are certainly unexceptionable, the effect of the aid is unmistakably to provide desired financial support for nonpublic, sectarian institutions. * * *

"First, it has been suggested that it is of controlling significance that New York's program calls for reimbursement for tuition already paid rather than for direct contributions which are merely routed through the parents to the schools, in advance of or in lieu of payment by the parents. The parent is not a mere conduit, we are told, but is absolutely free to spend the money he receives in any manner he wishes. * * * A similar inquiry governs here: if the grants are offered as an incentive to parents to send their children to sectarian schools by making unrestricted cash payments to them, the Establishment Clause is violated whether or not the actual dollars given eventually find their way into the sectarian institutions. Whether the grant is labeled a reimbursement, a reward or a subsidy, its substantive impact is still the same."

To the same effect is Sloan v. Lemon (1973), 413 U. S. 825, 93 S. Ct. 2982, 37 L. Ed. 2d 939, wherein it was said: "The State has singled out a class of its citizens for a special economic benefit. Whether that benefit be viewed as a simple tuition subsidy, as an incentive to parents to send their children to sectarian schools, or as a reward for having done so, at bottom its intended consequences is to preserve and support religion-oriented institutions." See, also, Almond v. Day, 197 Va. 419, 89 S. E. 2d 851; Hartness v. Patterson, 255 S. C. 503, 179 S. E. 2d 907; Wolman v. Essex, 342 F. Supp. 399, affirmed 409 U. S. 808, 93 S. Ct. 61, 34 L. Ed. 2d 69; Kosydar v. Wolman, 353 F. Supp. 744, affirmed 413 U. S. 901, 93 S. Ct. 3062, 37 L. Ed. 2d 1021; Public Funds for Public

Schools of New Jersey v. Marburger, 358 F. Supp. 29; People ex rel. Klinger v. Howlett (1973), 56 Ill. 2d 1, 305 N. E. 2d 129.

Although these cases dealt with questions arising under the First Amendment to the Constitution of the United States, they specifically hold that tuition allowances from public funds to parents of students are, in effect, appropriations for, or in aid of, private schools, and as such are impermissible. Direct allowance of such tuition funds to the students as distinguished from their parents is immaterial. The same factors are present. It is a patent attempt to sanction by indirection that which the Constitution forbids.

That aid to private schools was intended by the Legislature is quite apparent from the following language comprising part of the declared purpose in section 1 of the act, to-wit: "The independent institutions of this state have the capacity to handle more students without increasing faculty or facilities and can do so at a reduced cost to this state with the help of tuition grants; * * *." Furthermore, as heretofore noted, declarations made on the floor of the Legislature during consideration of the act make this purpose obvious. Further, unless this was the intention, would the grant have been limited to only students who attend independent institutions in Nebraska? Limiting the grants to students attending independent institutions in Nebraska insures that all these funds will inure to the benefit of institutions not owned or controlled by the state.

Respondent contends that L.B. 1171 is invalid as being in violation of Article III, section 18, of the Constitution of Nebraska, which prohibits the granting to any corporation, association, or individual any special or exclusive privileges, immunity, or franchises whatever and which further provides that in all other cases where a general law can be made applicable, no special law shall be enacted. As we pointed out in United Community Services v. The Omaha Nat. Bank (1956), 162 Neb.

786, 77 N. W. 2d 576: "The Legislature may make a reasonable classification of persons, corporations, and property for purposes of legislation concerning them, but the classification must rest upon real differences of situation and circumstances surrounding the members of the class relative to the subject of legislation which render appropriate its enactment.

"The Legislature may legislate in regard to a class of persons, but it cannot take what may be termed a natural class of persons, split that class in two, and then arbitrarily designate the dissevered fractions of the original unit as two classes and enact different rules for the government of each."

There are two areas in which L.B. 1171 violates this constitutional provision: The first is with reference to students who arguably are to benefit from the tuition grants involved in this legislation; the other involves institutions where post high school training may be received. These two propositions as they appear in L.B. 1171, while somewhat related, are nevertheless separate and distinct points.

The students must be resident students of college age; they must attend one of the independent colleges within the state; and they must meet a financial need test, which incidentally is not a poverty or welfare test. The student must be domiciled in Nebraska and admitted to a private college in Nebraska within 5 years of his high school graduation. Years spent in military service, however, will not count against this 5-year limit.

It thus appears the class of students eligible to receive these benefits is somewhat restricted. All students who are admitted to private colleges may not · participate. Those students who wait over 5 years before their admission are not eligible for grants in any event. No exception appears for sickness or complete lack of funds to make the basic payment upon tuition. Age alone cannot be claimed to be a factor inasmuch as military service is specifically exempted in computation of the

5-year period. Furthermore, no grant is permissible for students who meet the qualifications otherwise but who wish to attend private schools outside the state. The nature of the classification of the students appears to be primarily for the purpose of aiding the private institutions in the state rather than resident students.

If the purpose is to aid needy students in securing a post high school education, the classification is questionable in another regard. The training in the private schools is limited to the academic field. A student desiring to enter a private institution specializing in a vocational-type training is not eligible. Even if a student otherwise eligible is seeking vocational-type training in one of these authorized institutions, it appears he would not be eligible for the grant unless he is actually enrolled in a course of study which leads to an academic degree. It appears to us the law does not operate equally upon all individuals in the state but singles out a select few to whom a gift of taxpayers' money is to be made.

There is also a question as to the classification of the colleges, even assuming the law is not invalid because of the sectarian nature and private nature of the institutions concerned. Under the statute the school must either be an accredited school as that term is defined in the act or a school in existence at the time of the passage of the act and having a certain number of pupils. A reading of the floor debate indicates clearly that the purpose of the provision concerning a school in existence with at least 200 pupils was to permit John F. Kennedy College at Wahoo to participate in this benefit program. This is a sort of grandfather clause and does not require Kennedy College to become accredited. So long as it operates, it is eligible to participate. However, no other school in the future may so qualify. In fact, while it appears that the class is open insofar as church-related colleges are concerned, the class is really closed in all other respects. In view of the foregoing, we hold the

act is in violation of Article III, section 18, Constitution of Nebraska.

Respondent's cross-appeal urges L.B. 1171 violates the Establishment Clause of the First Amendment to the Constitution of the United States as made applicable to the states by the Fourteenth Amendment. The guarantee of the Establishment Clause of the First Amendment is protected against state infringement by the Fourteenth Amendment. Cantwell v. Connecticut (1940), 310 U. S. 296, 60 S. Ct. 900, 84 L. Ed. 1213, 128 A. L. R. 1352.

In Lemon v. Kurtzman (1971), 403 U. S. 602, 91 S. Ct. 2105, 29 L. Ed. 2d 745, the Supreme Court of the United States laid down a three-part test for a statute to pass constitutional muster when considered against the restrictions of the Establishment Clause. They are: First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; and third, the statute must not foster an excessive government entanglement with religion.

We have heretofore referred to Committee for Public Education & Religious Liberty v. Nyquist (1973), 413 U. S. 756, 93 S. Ct. 2955, 37 L. Ed. 2d 948, which covered a tuition grant program for tuition reimbursement for parents of children attending elementary or secondary nonpublic schools. In Sloan v. Lemon (1973), 413 U. S. 825, 93 S. Ct. 2982, 37 L. Ed. 2d 939, the Supreme Court held a Pennsylvania legislative enactment providing funds to reimburse parents for a portion of tuition expense incurred in sending their children to nonpublic schools was indistinguishable from Nyquist, and voided the statute.

A stipulation as to certain written policies of the various colleges and expected testimony of the presidents of the various colleges is a matter of record in this case. Of the independent institutions of higher education which resident students may attend to obtain grants, only two are not church related. All the others except two

require some courses in religion. Two of them require daily devotions or attendance at campus religious services. In the two which require no religious courses, members of the particular denomination predominate on the controlling board.

The stated purpose of L.B. 1171 is to make tuition grants to students attending institutions of higher education which are operated privately and not for profit. The purpose of the act is stated in section 1 thereof. It clearly applied only to independent colleges and universities. This includes those colleges and universities which are controlled or operated by religious groups. There is no attempt made in the bill to restrict the use of the tuition funds provided by the state solely to secular subjects. As suggested, all but four of the institutions require students to take some religious courses. It is to be noted that the only limit respecting religion appears in section 17 (1) of the act. This section provides that a student pursuing courses leading to a theological or divinity degree shall not be eligible to receive tuition grants. There is no restriction in the act that the proceeds received through these grants be limited to secular subjects, so obviously in some institutions these tuition grants finance sectarian subjects. This alone shows secular and sectarian subjects are so intertwined in and supported by the tuition grants that L.B. 1171 violates the Establishment Clause.

For the reasons given, we affirm the judgment of the District Court holding L.B. 1171 unconstitutional. We specifically find it in violation of Article III, section 18, and Article VII, section 11, of the Constitution of Nebraska. We also find L.B. 1171 unconstitutional under the Establishment Clause of the First Amendment to the Constitution of the United States, which question the trial court did not cover.

AFFIRMED.

CLINTON and McCOWN, JJ., dissenting.

The majority opinion holds the statutes here involved

unconstitutional on three separate grounds, finding that they violate (1) Article VII, section 11, of the Constitution of Nebraska; (2) the First Amendment to the Constitution of the United States; and (3) Article III, section 18, of the Constitution of Nebraska. This seems to us to be a case of judicial overkill and while the finding based upon ground numbered (1) is essentially one of first impression so far as our own precedents are concerned and must necessarily stand or fall without directly supporting authority (although analogous cases from other jurisdictions support a finding of constitutionality), we feel that the findings on grounds (2) and (3) either disregard or misapply, or both, sound precedent of the Supreme Court of the United States which is the basic authority when the Constitution of the United States is to be construed. Ground (3) involves our state Constitution and relates essentially to a classification question and United States Supreme Court opinions on the issue are in principle applicable.

A statute essentially the same as the one we have under consideration here was considered by a three-judge court in the United States District Court for the District of Kansas in the case of Americans United for Separation of Church & State v. Bubb, —— F. Supp. —— (February 27, 1974). The opinion in that case collates the applicable principles from opinions of the Supreme Court of the United States. Because of the availability of this convenient collation, we will in some instances quote from the opinion in that case as well as the primary authority and sometimes adopt the approximate language of that opinion without specific citation.

We first deal with the question of constitutionality as it relates to Article III, section 18, of our own Constitution re "exclusive privileges" and the asserted invalid classification. The majority opinion seems to say: That the requirement that the students be (1) residents of Nebraska; (2) they meet certain financial tests; (3) that they must be admitted to the college within 5 years

of high school graduation, but the time in military service is excluded from those years; (4) that the act is not applicable to students who want to attend a private school outside the state; and (5) that the act does not apply to students seeking vocational type training, all make the classification invalid.

No authority whatever is cited. The limitations are patently related to one of the purposes of the act which are stated by the Legislature to be to relieve the load on the public university and at the same time to provide a freedom of choice to the student with a consequent benefit to the taxpayers of the state. Absent the possible prohibiting effect of Article VII, section 11, the object sought to be accomplished is within the legislative purview and the means the Legislature has adopted are not demonstrably irrelevant to this policy which it would be free to adopt. The finding of the majority to the contrary seems to us to be an arbitrary edict and fails to observe the applicable constitutional standard found in the following cases: Nebbia v. New York, 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469; Ferguson v. Skrupa, 372 U. S. 726, 83 S. Ct. 1028, 10 L. Ed. 2d 93, 95 A. L. R. 2d 1347; Allied Stores of Ohio v. Bowers, 358 U. S. 522, 79 S. Ct. 437, 3 L. Ed. 2d 480.

We believe the matter will be seen in a clearer perspective if one were to in effect reverse the classification and assume that the Legislature had determined that the state had a great need for persons skilled in the vocational occupations, for example, the building trades; and that the state vocational schools could not accommodate the demand, and that to meet the need without expanding the state schools it authorized tuition aid to students to meet these needs. Surely the classification is not suspect because merely academic training is not included; nor because some financial need is a criteria. The Legislature can classify in accordance with the needs of the state and take necessary steps to meet those needs.

Adoption of a ground of decision based on classification, we believe, bodes ill for future cases involving classification questions. We doubt greatly the judicial wisdom of such a precedent.

In Americans United for Separation of Church & State v. Bubb, *supra,* the court held the classification valid, saying: "The law is well settled, however, that the equal protection clause of the Fourteenth Amendment does not deny a state the power to treat different classes of persons differently; what the clause does prohibit is legislation treating those statutorily imposed classes differently based upon criteria wholly unrelated to the objective of the statute. If the statutory classification is reasonable, and rests on some ground of difference having a fair and substantial relation to the object of the legislation so that all persons similarly situated are treated alike, there is no violation of the equal protection clause. Reed v. Reed, 404 U. S. 71 (1971); Dandridge v. Williams, 397 U. S. 471 (1970). While the Statute in question establishes a class of students limited to those attending private colleges, the Statute in no way discriminates against the class of students attending state colleges and universities. Any student attending a state institution of higher learning automatically receives state aid at least equal to the amount a student may receive under the tuition grant program. (This is true in our case also.) Admittedly two classes of college students exist, but both are treated similarly and thus the Statute creates no discrimination between the two classes.

"Assuming arguendo the Statute does produce unequal treatment, plaintiffs still have failed to show that the Statute bears no rational relationship to legitimate state purposes. As noted in Brown v. Board of Education, 347 U. S. 483, 493 (1954), 'education is perhaps the most important function of state and local governments.' And education is enhanced by the role private institutions play in raising national levels of knowledge, competence

and experience. Board of Education v. Allen, 392 U. S. 236 (1968). The State therefore has a legitimate interest in advancing the welfare of its college population and of its private educational institutions."

The majority opinion completely ignores the mandate of our own Constitution contained in Article I, section 4, which after the provision for freedom of worship, conscience, and the prohibition against compulsory attendance and support of any place of worship and the prohibition of discrimination on account of religious belief or lack of it, goes on to say: *"Religion, morality, and knowledge,* however, being essential to good government, it shall be the duty of the Legislature to *pass suitable laws* to protect every religious denomination in the peaceable enjoyment of its own mode of public worship, *and to encourage schools and the means of instruction."* (Emphasis supplied.) The words in this section of the Constitution directing the passage of suitable laws to encourage schools certainly mean more than a mere statutory exhortation of encouragement. The term "pass suitable laws" can only mean laws which have an effect and which require implementation. This section of our Constitution cannot refer to the common schools of the state, the mandatory establishment of which is required by the specific provisions of Article VII, section 1, which reads: "The Legislature shall provide for the free instruction in the common schools of this state of all persons between the ages of five and twenty-one years."

Let us now turn to the First Amendment argument. The majority opinion properly relies upon the three-pronged test of Lemon v. Kurtzman, 403 U. S. 602, 91 S. Ct. 2105, 29 L. Ed. 2d 745, but, we believe, misapplies it. There is not the slightest evidence of intent to aid religion either in stated legislative purpose or in the stipulated evidence. The Supreme Court of the United States has repeatedly and consistently held that the First Amendment does not prohibit all contact between state and church. As Justice Black said in Zorach v.

Clauson, 343 U. S. 306, 72 S. Ct. 679, 96 L. Ed. 954 (1952) (as paraphrased in Americans United for Separation of Church & State v. Bubb, *supra*): ". . . if all contact were prohibited between church and state policemen would not be allowed to help parishioners into their place of worship, prayers in our legislative halls would be prohibited, the proclamation making Thanksgiving Day a holiday would be unconstitutional, and all references to God running through our laws, our public rituals, and ceremonies would be flouting the First Amendment."

The interpretations of the Supreme Court of the United States indicate that the Establishment Clause does not demand separation in all respects. For example, New York City's public schools were permitted to release during school time those students who wished to attend religious courses operated outside the school building by a duly constituted religous body. Zorach v. Clauson, *supra*. New Jersey was allowed to spend tax dollars to pay the bus fares of parochial school pupils. Everson v. Board of Education, 330 U. S. 1, 67 S. Ct. 504, 91 L. Ed. 711. New York was permitted to order local public school authorities to lend textbooks free of charge to students in grades 7 through 12 attending parochial schools. Board of Education of Central School Dist. No. 1 v. Allen, 392 U. S. 236, 88 S. Ct. 1923, 20 L. Ed. 2d 1060 (1968). And South Carolina was allowed to issue revenue bonds which provided to a Baptist controlled college financial assistance in the construction of additional buildings and facilities. Hunt v. McNair, 413 U. S. 734, 93 S. Ct. 2868, 37 L. Ed. 2d 923.

The United States Supreme Court cases, including Hunt v. McNair, *supra*, have all reiterated: "Whatever may be its initial appeal, the proposition that the Establishment Clause prohibits any program which in some manner aids an institution with a religious affiliation has consistently been rejected. E.g., Bradfield v. Roberts, 175 U. S. 291 (1899); Walz v. Tax Comm'n, 397 U. S.

664 (1970); Tilton v. Richardson, supra. Stated another way, the Court has not accepted the recurrent argument that all aid is forbidden because aid to one aspect of an institution frees it to spend its other resources on religious ends.

"Aid normally may be thought to have a primary effect of advancing religion when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission or when it funds a specifically religious activity in an otherwise substantially secular setting. In Tilton v. Richardson, supra, the Court refused to strike down a direct federal grant to four colleges and universities in Connecticut. Mr. Chief Justice Burger, for the plurality, concluded that despite some institutional rhetoric, none of the four colleges was pervasively sectarian, but held open that possibility for future cases: 'Individual projects can be properly evaluated if and when challenges arise with respect to particular recipients and some evidence is then presented to show that the institution does in fact possess these characteristics.' 403 U. S., at 682." Hunt v. McNair, *supra*.

The cases have all pointed out that the mere fact that a college is church related does not bar aid and that a mere formalistic relationship does not render all aid in violation of the Establishment Clause. Hunt v. McNair, *supra,* note 8. The burden of proof of showing the extent of church relationship in applying the three-pronged test is upon the plaintiffs. Hunt v. McNair, *supra,* note 8; Board of Education of Central School Dist. No. 1 v. Allen, *supra*.

In our case the legislative purpose is clearly a secular one: To relieve the burden on the public institutions by enabling qualifying students to attend the private school of their choice. A tuition grant on the college level is not a sectarian purpose. Committee for Public Education & Religious Liberty v. Nyquist, 413 U. S. 756,

93 S. Ct. 2955, 37 L. Ed. 2d 948; Americans United for Separation of Church & State v. Bubb, *supra*.

Does the present act have the primary effect of advancing religion? The Nyquist, Sloan, and Levitt cases (all referred to in Bubb) all involved elementary and secondary schools with a sectarian mission. Here the issue is whether the colleges involved have a sectarian mission. To determine that issue we must look at the evidence. This is what the Federal District Court did in Americans United for Separation of Church & State v. Bubb, *supra*, in accordance with the directions of the Supreme Court of the United States in Hunt v. McNair, *supra*.

The Supreme Court of the United States recognizes and has repeatedly reiterated that aid to education does not necessarily have the same effect in church related institutions of higher learning as it does in parochial and elementary schools. Walz v. Tax Commission, 397 U. S. 664, 90 S. Ct. 1409, 25 L. Ed. 2d 697; Tilton v. Richardson, 403 U. S. 672, 91 S. Ct. 2091, 29 L. Ed. 2d 790; Hunt v. McNair, *supra*. The Kansas federal court in the case referred to summarizes the criteria laid down by the Supreme Court of the United States in making such determinations under the following considerations: (1) Religious restrictions on admission. (2) Required attendance at religious activities. (3) Required obedience to doctrine and dogmas of a particular faith. (4) Required attendance at courses on theology or doctrine of a particular faith. (5) Are the colleges an integral part of the religious mission of the church sponsoring them. Mere opportunity for involvement is not disabling. (6) Is a substantial purpose the inculcation of religious values. (7) Are religious restrictions imposed on faculty appointments.

Accordingly the court would be required to examine the evidence in this case and make a separate determination with reference to each of the schools involved. Our own examination would indicate that two or perhaps

three of the schools involved would be debarred and that the others are not. In Tilton, at p. 687, the United States Supreme Court concluded: "In short, the evidence shows institutions with admittedly religious functions but whose predominate higher education mission is to provide their students with a secular education." In Tilton, direct aid to church-related colleges was upheld, the court saying: "There are generally significant differences between the religious aspects of church-related institutions of higher learning and parochial elementary and secondary schools. The 'affirmative if not dominant policy' of the instruction in pre-college church schools is 'to assure future adherents to a particular faith by having control of their total education at an early age.' . . . By their very nature, college and postgraduate courses tend to limit the opportunities for sectarian influence by virtue of their own internal discipline. Many church-related colleges and universities are characterized by a high degree of academic freedom and seek to evoke free and critical responses from their students." We note here that students studying for the ministry are excluded from tuition aid under the act.

The entanglement criteria is, in our judgment, not at all applicable in this case.

We will now turn to the central question and that is the application of Article VII, section 11, of our own Constitution. If, of course, the plan which the statute authorizes is not "in aid of" then the First Amendment issue is effectively disposed of as is the Article VII, section 11, question.

The sole possible benefit which can accrue to any of the institutions in question is the possibility that the statute will get for them more students. The plan does not relieve any of the institutions of any portion of their costs or expense. The evidence shows that the cost of educating a student in each of the colleges in question exceeds the tuition charge by a substantial amount. The tuition grant which an eligible student will receive, to-

gether with the amount paid by him from his own funds or other sources, does not in any case equal the cost to the institution of educating the student. The institution gets no more than it would in any event. It is not aided in the constitutional sense.

We think the point can be well made by analogizing the method under which the tuition grants would operate to the manner in which the State of Nebraska provides education for students in veterinary medicine and surgery. The state has no veterinary school but it does appropriate to the University of Nebraska a sum of money known as "(8) the Veterinary School Fund." § 85-122, R. R. S. 1943. The University then contracts with out-of-state veterinary schools to accept Nebraska residents for training at the same tuition charges made to their own resident students. The University of Nebraska then makes up this difference from the Veterinary School Fund. A part of this package is reciprocity to other schools in areas of training which their own schools do not afford.

It seems to us that the fact that the contracts are made by the University of Nebraska and paid from tax funds cannot change the color of the horse. Neither can the fact that services are exchanged affect the nature of the transaction.

We do not believe that this procedure for providing veterinary education for Nebraska residents violates the "in aid of" provision of our Constitution merely because a school outside the state, which of course is "not exclusively owned and controlled by the state or any subdivision thereof," is enabled to better perform its function or because the State of Nebraska accomplishes a desirable result using the facilities of out-of-state schools. The benefit accrues to the state and its people just as it does in the case of the tuition aid program we are considering. Yet if the act we are considering is unconstitutional, so is the appropriation to

the "Veterinary School Fund," the proceeds of which go directly to schools "not exclusively owned and controlled by the state or a governmental subdivision thereof." We believe in the constitutionality of that appropriation and abhor the precedent of the majority opinion which would require, if the issue is ever raised, a declaration of the unconstitutionality of the appropriation for veterinary training if we are to adhere to the principle of stare decisis. This, of course, we must do in cases which are not distinguishable if we are to be governed by principle and are not ourselves to be considered lawless.

The appellant's brief sets forth pertinent authority on the "in aid of" question and we quote directly from the brief: ". . . in Community Council v. Jordan, 102 Ariz. 448, 432 P. 2d 460 (1967), the Arizona Supreme Court measured that state's constitutional prohibition of appropriations 'in aid of' sectarian organizations against a program whereby the State Department of Welfare provided matching funds of $1.00 (40%) for every $2.50 spent by the Salvation Army in giving emergency relief to needy residents. In holding that the 40% reimbursement did not constitute the type of 'aid' that was forbidden by the Arizona Constitution, that Court said:

" 'In order to fulfill the original intent of the constitution, the word "aid" like the word "separation" must be viewed in the light of the contemporary society, and not strictly held to the meaning and context of the past.

" '. . . The encouragement by partial reimbursement of any person or an organization to spend more than it will receive is hardly "aiding" that person or organization on to a healthy financial future and in fact, may tend to preclude any future at all.' 432 P. 2d at 466. . . .

"The interpretation given to the term 'aid' by the Arizona Court in Jordan, supra, has been expressed by

other jurisdictions as well, particularly in tuition reimbursement cases. In State ex rel. Atwood v. Johnson, 170 Wis. 251, 176 N. W. 224 (1920) the Supreme Court of Wisconsin upheld the Wisconsin Educational Bonus Law, an Act that would provide financial assistance to servicemen who wished to continue their education after discharge. The Act provided that all institutions, public or private, sectarian or non-sectarian, which enrolled qualifying veterans would be reimbursed by the state for the actual increase of costs incurred through the attendance of such students. Opponents of the bill challenged its constitutionality on the ground that it 'gives financial aid to religious schools.' 176 N. W. at 224. To this the Wisconsin Court replied:

" 'The contention that financial benefit accrues to religious schools from the Act is untenable. Only actual increased cost to such schools occasioned by the attendance of beneficiaries is to be reimbursed. *They are not enriched by the service they render. Mere reimbursement is not aid.'* 176 N. W. at 228 (emphasis added)."

The case of Synod of Dakota v. State, 2 S. D. 366, 50 N. W. 362, 14 L. R. A. 418, cited in the majority opinion, is not applicable because there the state was paying 100 percent of the cost of the education.

We continue from appellant's brief: "The 'less than cost' doctrine has also been adopted by the Illinois Supreme Court in interpreting that part of the Illinois Constitution which prohibits state 'aid' to sectarian institutions. In Dunn v. Chicago Industrial School for Girls, 280 Ill. 613, 117 N. E. 735 (1917) that Court held that Illinois' constitutional prohibition on 'aid' to sectarian institutions was not violated when Cook County appropriated and paid $15 per month for each girl committed by the juvenile court to the Chicago Industrial School for Girls, a school conducted by the Religious Sisters of Mercy. This was so because the

amount paid by the state was less than it would cost the state if it were to send the girls to the State Training School for Girls ($28.88/month) and the amount paid was also 'less than the cost of food, clothing, training, medical care, *and tuition* furnished to the wards of the county' by the institution. 117 N. E. at 736 (emphasis added). Thus, no prohibited 'aid' resulted from such payments.

"The Supreme Court of Oklahoma has adopted this same point of view. In Murrow Indian Orphans Home v. Childers, 197 Okla. 249, 171 P. 2d 600 (1946), it was held that state payments to a Baptist children's home were not in violation of the Oklahoma constitutional prohibition against appropriations 'directly or indirectly, for the support or benefit of' a church or sectarian institution. The record demonstrated that the State made annual payments of $70 per child, but the actual per capita operating costs of the home were from $225 to $250 per child. The Oklahoma court determined that the State was not only fulfilling its duty by such payments, but that it was also receiving a substantial element of return in such an arrangement. As a result, the payments were deemed to be relevant 'to the affairs of the State' and not offensive to the state constitution."

This seems to us clearly a case where the proposition (which we have up to now rather consistently adhered to), that where there is a reasonable doubt as to constitutionality the statute must be upheld is applicable. Dwyer v. Omaha-Douglas Public Building Commission, 188 Neb. 30, 195 N. W. 2d 236. We would find the statutes in question constitutional.